Filed 2/9/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KIARRA MARIE PRICE,<br><br>    Defendant and Appellant. | A140775<br><br>(Contra Costa County<br>Super. Ct. No. 51103373) |

Defendant Kiarra Marie Price, then 20 years old, along with two friends, participated in a robbery of Benjamin Merrill during which one of them needlessly and senselessly shot and killed 22-year-old Merrill. The Contra Costa District Attorney charged Price and her friends, Kendra Fells and Teareney Brown, with murder and robbery, entered into plea agreements with Fells and Brown that resulted in convictions for voluntary manslaughter, robbery and other charges and 15-year sentences for each, and prosecuted Price for murder and robbery. Fells testified with immunity against Price at Price's trial. The jury convicted Price of robbery and first degree murder and found a robbery-murder special-circumstance allegation to be true, but rejected allegations that Price personally used and discharged a gun and inflicted great bodily injury on Merrill. The court sentenced Price to life without parole as required by the special circumstance statute, Penal Code section 190.2.[1]

Price appeals on several grounds. Her primary argument is that the People, by representing to the court that her co-defendants committed voluntary manslaughter and prosecuting Price for murder, adopted versions of both the law and the facts that were irreconcilable and deprived Price of due process. We disagree. Voluntary manslaughter

---

[1] All statutory references in this opinion are to the Penal Code.

is a lesser included offense of murder and not legally irreconcilable with it. Further, defendant does not establish the prosecution engaged in misconduct in any of its factual contentions regarding Price, which were not necessarily irreconcilable with its contentions regarding Fells and Brown. Assuming these contentions contained inconsistencies, they were justified in light of the evidence available to the prosecution when they were made and in any event any purported error was not prejudicial to Price.

Price asserts several other due process-based grounds for challenging her conviction and the special circumstance determination, including that the prosecutor should not have been permitted to pursue an uncharged conspiracy theory, the instruction on robbery-murder special circumstance was unconstitutionally vague, the instruction on flight as a basis for inferring consciousness of guilt was inconsistent with the Penal Code and unfairly lightened the prosecution's burden of proof, and the prosecutor unfairly vouched for Fells, its key witness. None of these arguments is persuasive, and neither, therefore, are Price's related arguments of ineffective assistance and cumulative error. We agree with Price's challenge to the imposition of a parole revocation fine, an issue which the People concede. For these reasons, we affirm the judgment in all respects other than the parole revocation fine, which we strike.

## BACKGROUND

### I.

### *The Charges, Initial Plea Agreements and Preliminary Hearing*

In late November 2009, the district attorney filed a complaint charging Price, Brown and Fells with the first degree murder and second degree robbery of Merrill, both with enhancements as to Price only for personal use and discharge of a firearm and causing great bodily injury or death.

Both Fells and Brown made certain statements to investigators, both before and after entering into plea agreements. Fells in particular revealed certain limited facts beforehand. She claimed Price shot Merrill, admitted being present when he was shot, and admitted knowing there was going to be a robbery shortly before it occurred. In connection with her plea agreement she further admitted that the gun was hers, that Price

2

had taken it from a drawer where Fells kept it, and that Fells took the gun back after the robbery and got rid of it to cover up the crime. Initially Fells denied that Brown was involved but later admitted that she was and that Brown and Price robbed Merrill before he was shot.

A preliminary hearing was held as to Price in February and March 2011. At the hearing, the prosecutor and defense counsel for Fells and Brown announced that they had reached agreements whereby these co-defendants would plead to lesser offenses, cooperate and testify truthfully against Price and receive immunity for their testimony, and that the People would dismiss the murder charges against them and recommend determinate sentences. Fells's plea agreement, which had been reached in August 2010, called for reduction of the charges to voluntary manslaughter, robbery and supplying a weapon, and a sentence of 15 years in state prison.

Fells testified at the preliminary hearing pursuant to her plea agreement in a manner consistent with her statements to police. Brown also testified pursuant to a plea agreement, which apparently involved a proposed sentence of eight years. However, her testimony diverged from her previous statements to investigators, the most significant difference being that she testified Fells was the shooter when she previously had said it was Price. Brown claimed she had lied previously because she was afraid of Fells, who was housed in the same jail module as Brown and had attempted to bribe her with "commissary and stuff."

At the conclusion of the preliminary hearing, the trial court held Price over to answer all charges and enhancement allegations, finding no serious question about the robbery and murder charges. "Whatever version of the evidence one takes, all of these people are shown to have either committed or aided and abetted in the 187."[2] Regarding the firearm enhancement allegations, the judge found Brown not credible and, disregarding her testimony, concluded there was "sufficient evidence for a strong suspicion as to possession and discharge of the weapon by Ms. Price." It appears that,

_____

[2] Section 187 defines the crime of murder.

3

based on the failure of Brown to consistently tell the truth, the prosecution revoked her plea agreement.

## II.

### *Price's Trial*

In September 2013, the court granted a motion by Brown, joined by Price, to sever their trials, and proceeded with Price's trial first. After six-and-a-half days of testimony by more than two dozen witnesses,[3] the People rested. The defense called no witnesses.

### A. Kendra Fells's Testimony

Fells testified that at the time of trial, she was serving a 15-year sentence for voluntary manslaughter, furnishing a firearm and robbery that resulted from the plea agreement. She said she was testifying both because of her plea deal and to do the right thing. She understood her deal would be off if she lied to the jury, including to help the prosecutor, even though she had already served nearly three years in prison and that she would then face murder charges.

Fells testified that in November 2009, she was friends with Price and had known her for years. Both were also friends with Brown and Nickia Darden. Fells was romantically involved with Felicia Edosa, who lived in Pittsburg, California with her parents and sister. Fells sometimes spent the night with Edosa and shared Edosa's upstairs bedroom. Fells had recently purchased a revolver because "I got myself into a situation" and "needed to protect myself." When she was at Edosa's house she kept the loaded revolver in a drawer in the bedroom. She did not tell Edosa about it. Price had frequently visited Fells at Edosa's house.

On the evening of November 2, 2009, Fells and Edosa were at Edosa's house. Sometime after 11 p.m., Fells was awakened by Price entering the bedroom. Fells was "really intoxicated," having been to a funeral that day where she drank and took drugs. She told Price about an altercation she had gotten into, showed Price her revolver, and returned it to the drawer while Price was there. Fells went outside to get a CD from her

---

[3] Brown was among the witnesses called to testify by the People, but she invoked her Fifth Amendment right to remain silent.

4

car that Price requested. She saw Brown in a car she recognized as Nicky Darden's. Fells gave Price the CD, and about 20 minutes after they had arrived, Price and Brown left in Darden's car with Brown driving. Fells then went back to bed.

Sometime after 1:00 a.m., Fells woke to again find Price in her bedroom. Price asked Fells to "take a ride with her." When they went downstairs, Fells saw Price putting Fells's gun into Price's jacket. She also saw an iPhone she did not recognize on the living room couch. They left in Darden's car. Brown drove, and a man Fells did not know was in the back seat asleep. Fells learned later he was Merrill. There was no conversation, and Fells was "tired and intoxicated." Although she knew Price had her gun, Fells did not suspect something was going on or that there was going to be a robbery. They drove to a park about a mile from Edosa's house, where everyone, including the awakened Merrill, got out of the car.

Merrill went to some bushes near a sign at the entrance to the park and urinated. Fells, Brown and Price were "standing around" nearby. Merrill started rambling, and Fells could tell he was drunk. He said, "You think you better than me," talking to "[n]obody in particular." After urinating, Merrill turned around and walked in a direction away from the car. Brown was standing close to him, and Fells heard Brown say, "I got it." Brown then headed for the car. Fells was standing near the car. She did not see Price, but told her to "come on." After that, Fells heard Price say: "He got more." She saw Price next to Merrill, pointing the gun at Merrill's chest. Fells said, "Come on" and "Let's go." Fells understood Price was robbing Merrill. She did not tell Price to stop; she "just told her to come on." After that, Fells was trying to get in the car, but turned around and saw Price on the ground. She did not see where the gun was pointing but heard two shots, "kind of like all back to back, like fast," and saw a flash. After that, she did not see Merrill, who was not on top of Price.

After the second shot, Fells, Brown and Price got back in the car. Fells said to Price, "Fool, give me the gun." Fells did not know then whether Merrill had been shot. She knew the gun had gone off and was angry at Price "[b]ecause of the situation that we were all in." Price gave the gun to Fells. Fells saw a man's wallet on the armrest in the

5

car. Fells did not know if there was money in the wallet, never got any money, did not see the iPhone in the car and did not get the iPhone. There was no conversation in the car about the wallet or anything else. "[I]t was all kind of like silence. We were all kind of like in shock kind of." They drove away "pretty fast." There was no plan. Brown drove Fells back to Edosa's at her request. Fells was upset by what had happened. Fells, Brown and Price got out of the car and went into the house. They did not talk about what had happened. Edosa was there. Fells did not tell Edosa what had happened.

Fells did not remember talking with Edosa later that night. At some point, Edosa asked her whether she recognized a phone number from which a lot of missed calls had been placed to the phone she and Edosa shared. This was between the first and second times Price came over that night, and later Fells learned the phone had been Merrill's. In the morning, after the shooting, she received a call from the same number and answered it, anticipating it would be Price. It was Price, who asked if Fells was okay. Fells told Price not to call her anymore from that phone number.

About a week later, Fells saw Price with the iPhone and told her to get rid of it. By then, Fells had read in the newspaper what had happened to Merrill. Before they spoke, Fells and Price had texted each other. Fells texted Price that "she did too much," meaning that Price had not needed to shoot Merrill. Price texted back that she did what she had to do. Fells testified that she also texted Price that Price had "put me in a hole," meaning she had spent money on the gun and now had to get rid of it.[4] Fells sold or gave it to someone.

---

[4] The text message conversation was as follows:

"[Fells]: A blood
"[Price]: was hatnin
"[Fells]: Blood, I ain't lie cu I been hot at you blood.
"[Price]: Wut
"[Fells]: Nigga, I been (nn)ad at you nigga
"[Price]: O so
"[Price]: WTF you been mad 4
"[Fells]:  Cause nigga u do to (nn)uch when it don't need to b did.

6

Fells admitted that when police first arrested and interviewed her, she was not entirely truthful. But the police continued to question her. After they persuaded her they had built a case against her, she began to cooperate a little. She told them about Brown and Price but still held some things back because she did not want Edosa involved in the case. She told them Price had shot Merrill. This was before she entered a plea deal.

On cross-examination, Fells admitted she had previously been convicted of grand theft from a person, a crime in which another participant had a gun, and that this same individual helped her get rid of her gun after it was used to kill Merrill. She also admitted she wanted to protect her girlfriend, Edosa, at all costs if she possibly could, and that while in custody she and Edosa were roommates and talked. Also, at one point while in custody she and Brown were both housed on a module where the walls were thin enough for the inmates to talk to each other. Fells also said she previously had a romantic interest in Brown, and that Brown had Fells's nickname ("Kenny Bo") tattooed across her breast.

---

"[Price]: Nigga that's y u n yo bitch been actin like hoes
"[Price]: Nigga idgaf nigga it need it 2 b did regaurdless
"[Fells]: It really didn't
"[Price]: Jus on how it was done nigga I been doin dis shit I kno wut I was doin
"[Price]: Nigga how the fuck u gone tell me
"[Fells]: I don't care about none of that nigga u put in hole oxer wat nigga nothing
"[Price]: Wut
"[Fells]: Nigga u put (nn)e in a hole nigga for pennys nigga I got to cash out
"[Price]: Nigga how I put u n the whole
"[Price]: N u can keep that 30 I owe u dubb
"[Fells]: I don't care about tha (nn)oney hoe I (nn) say u need to start thinkn b4 u do stupid shit nigga
"[Price]: bitch if I wasn't thinking yo dumb ass wild b in jail rite now or dead so beloved me nigga I was thinking
"[Fells]: Read tha paper hoe
"[Price]: Wut it's talkin bout"
"[Fells]: Bitch get on tha net and look at
"[Price]: 2days paper?
"[Fells]: Tha last few days"

Fells also testified that she had lied multiple times when questioned by the police and had not told the full truth until a plea deal had been discussed. She said the police had interviewed her at length, yelled, screamed and cursed at her, threatened her and ignored her requests for an attorney. They told her they had already talked with Brown and Price, that Brown and Price were looking out for themselves and she needed to start looking out for herself, and that Price was going to blame all of this on her. They told her the case was serious, and she could be looking at the death penalty or life without parole. They told her if she did not "tell them what they believed to know" about the case they would "go smash [her] girlfriend's door in" and arrest her girlfriend. They repeatedly told her they knew Price was the shooter. She said Price was the shooter only after police told her they knew it.

Fells testified that she eventually admitted to police that she had lied in some respects and told them the truth—that the gun was hers, she had owned weapons before, she was a convicted felon and not allowed to possess weapons, and she had bought the gun from some guy off the street. She also admitted, after initially lying about it, that Brown had been a participant as well, rather than Fells and Price alone. It was not until the third interview, after the plea agreement had been discussed and she knew what would be offered to her, that she told police the full truth, including that Price came to her house twice and got the gun out of the drawer, Price asked Fells to ride with her, they went to the park, Merrill was robbed and shot and Fells gave the gun to the man with whom she had previously committed grand theft. She wanted to fulfill the terms of her plea agreement because she did not want to be sitting where Price was sitting, and testified in part to do the right thing. But she acknowledged that she never called police after the shooting, even anonymously, and got rid of the gun and told Price to get rid of the phone after she learned Merrill was dead.

On redirect, Fells testified that before the shooting she had seen Price handling handguns of different kinds on multiple occasions and that weeks before the Merrill killing, Price told Fells that police had confiscated Price's gun.

## B. Felicia Edosa's Testimony

Edosa testified that pursuant to an agreement with the district attorney, charges against her as an accessory after the fact were dropped and she was given immunity in exchange for her truthful testimony.

Edosa said she had known Fells since early 2009. They began a romantic relationship. Edosa lived with her parents and sister, and in November 2009 Fells was staying with her, sharing her upstairs bedroom. Edosa met Price through Fells. Fells and Price were "[t]wo peas in a pod," meaning "very close friends," and had previously lived together in Vallejo.

Edosa met Brown through Price. Brown was romantically involved with Nickia Darden in 2009, and also was in a relationship with Price. Edosa knew Darden from a gospel singing group and told her about Brown's relationship with Price, but Darden did not want to believe it. Darden let Brown use her parents' car and gave her money.

On November 2, 2009, at around 11:00 p.m., Price came to Edosa's house. Edosa was putting out the trash, and Price asked where Fells was. Edosa told her Fells was upstairs sleeping. Price said she needed a CD she left in Fells's car and went upstairs. Later, she came back down and left. Fells then came down and expressed irritation at having been awakened and asked why Edosa had let Price into the house. Fells put on her shoes, got her keys, went outside and then came back in. A few minutes later, as Edosa was leaving to get dinner, she saw Price in a car with Brown. She recognized the car as Darden's parents' car, a dark Hyundai. Brown was behind the wheel, and Price was in the passenger seat.

Later that night, Edosa checked her phone. She noticed more than 20 missed calls made close in time from a number she did not recognize. At about 1:00 a.m., Price knocked on the door. Edosa, who by then was downstairs, opened the door, and Price said, "What's up? Why you not answering the phone?" Price asked where Fells was, said she "need[ed] to get some of my stuff out of her car" and ran up to the bedroom. Price had a phone in her hand, which she tossed on the couch. It was an iPhone. Edosa picked it up and noticed a text that "said something about somebody standing someone

9

up for a date." Price came back down alone, and as she was heading out the front door Edosa handed her the iPhone. Fells then came down, put on shoes, grabbed her keys and said she was going outside. Edosa did not see a gun in Fells's or Price's hands before they left.

About 15 to 20 minutes later, Edosa heard noise outside her window. She looked out and saw Fells walking back toward the house and Price and Brown near the Dardens' dark-colored Hyundai. Price was coming from the passenger side, and Brown from the driver's side. Brown and Price were talking with their voices raised, but Edosa could not hear the conversation. Fells was just walking toward the house. Edosa realized she had locked the door, and went downstairs to let Fells in. When she opened the door, Fells was standing there shaking with tears welled up in her eyes and looked like she had seen a ghost. Fells began to weep as they went upstairs, and continued when they were in bed. She said to Edosa, Price "is not cool." When Edosa asked "[W]hat?," Fells told her there was a "young white guy" in the car with them, they had gotten out of the car, when Fells was going back to the car she heard shots, and the guy did not get back in the car. Fells said Price had shot the gun. Fells did not see anyone get shot, but the guy did not get back in the car with them. She hoped he ran. Edosa testified that Marina Walk Park is about a two-minute drive from Edosa's house.

Edosa had seen Price with a gun on multiple occasions. Once when they were walking where "there were a lot of guys out," Price told her not to worry, "I got you," and showed her a revolver. On the Fourth of July, Price playfully fired a couple of shots in the air from a revolver. Price showed Edosa some of her rifles at her Vallejo home and in her car, and seemed to know how to use guns.

On cross-examination, Edosa testified that Fells never told her the gun used on November 2 belonged to Fells. Edosa eventually learned that from police, who also told her Fells got rid of the gun. Edosa later asked Fells whether this was the first time she had brought a gun into Edosa's house and whether the gun was still there. Fells denied having brought a gun into Edosa's house. She told Edosa that on November 2, 2009, she

10

and Price had an altercation about the gun in which Price pointed it at Fells and Fells, after demanding, "[g]ive me that gun back," took it from Price.

Edosa admitted she lied when she first spoke to police. At the time, she knew something serious had happened, someone had died, and Fells had been there when it happened. She did not tell police then what Fells had told her. She denied that Price had been to the house and that Fells had left with Price. She lied because she did not want to put her family in any kind of danger, did not want to have anything to do with it, and was still in shock and disbelief about everything that was coming to the surface.

Edosa was in custody from November or early December 2009 to February 2010, having been arrested after making false statements to the police. Fells and Edosa were cell mates for some of that time. After Edosa retained a lawyer, she gave a statement to police in exchange for her cooperation, and under the agreement she was released from custody.

### C. Leonard Wilks

Leonard Wilks testified that in 2009 he was in a relationship with Brown's mother, lived with her and Brown, and considered Brown his "stepdaughter." In early November 2009, he was in his garage with Brown and Brown's friend, Price. Price had an iPhone that Wilks had not seen her with before, and he asked her where she got it. She responded "Ah, just a little lick. Just a little lick." Wilks understood that to mean "you got it from somebody[,] [w]hether you stole it or somebody gave it to you."

### D. James and Jamie Volberding

James and Jamie Volberding, father and son, both testified. In 2009, they lived across the street from Marina View Park. Close to 3:00 a.m. on November 3, 2009, both of them heard two loud gunshots that sounded like they were coming from the park. Jamie poked his head out of their front door and saw a car across the street at the end of the park pulling out. Its engine was loud, and he heard the tires burning rubber. After the car was out of earshot, he heard the sound of moans and phlegmy coughing. Upon investigating, he and his father found a man in his mid-20s to early 30s laying in the park on his side; he was no longer coughing and did not respond to questions. Jamie called

11

911.  James and Jamie did not see a wallet or phone in the area.  They remained with the victim until police arrived, which took about five minutes.

## E.  The Dardens

Nickia Darden, also known as "Nicky," and her parents, Monica and Ronald Darden, testified.[5]  Together, their testimony indicated that in 2009, Nicky knew Edosa from a singing group, met Brown, Price and Fells through Edosa, and had a romantic, albeit not intimate, relationship with Brown.  Nicky used her mother's dark blue Hyundai Sonata to get to her night job in Richmond.  Unbeknownst to her parents, she often allowed Brown to borrow the car while she was at work.  On November 2, 2009, Brown borrowed the car and then picked Nicky up at the end of her shift at about 3:30 the next morning.  Price was asleep in the back seat of the car.  Nicky noticed the gas was lower than it had been when Brown took the car.

A few days later, Nicky was at Brown's house with Price, Brown, Brown's stepdad, Leonard Wilks, and Brown's mother.  Price was playing with an iPhone.  When Wilks asked where she got the phone, Price said "Just a lick I pulled."  A "lick" means "being robbed or robbing someone."  Not long after that, Brown called Nicky and, Nicky testified, told her, "if the police talked to me, I don't know anything.  The car—I had the car the whole night and I don't know anything."

The Dardens had a FasTrak transponder and account for the car, which was the only car for the household.  When police contacted Ronald asking about the car's use and certain crossings on the Bay Bridge, Ronald looked up some things in the FasTrak account.  He saw one unfamiliar instance of a bridge crossing into San Francisco on November 3, 2009, at 1:21 a.m.  He gave police a printout of three pages from the account.

## F.  Merrill's Roommates and Friends

Three of Merrill's roommates testified.  Merrill lived with them in a house in San Francisco and worked as a waiter in a local restaurant, where he made good tips.  In

---

[5] Where multiple family members with a shared last name testified, we refer to them by their first name for clarity and mean no disrespect.

2009, Merrill owned the latest iPhone, which he loved, used a lot, and carried with him. He also had a wallet, which he carried in his pocket. He was friendly and not a violent person, although he sometimes drank to excess and had once been hurt in a fight at a bar.

On the evening of November 2, 2009, Merrill dressed up to go on a date with a woman he had recently met and planned to go with her to North Beach. He was excited about the date, and took at least a hundred dollars with him to cover the cost of drinks and dinner. He took his iPhone and left the house on foot. After he left that evening, his roommates never heard from him or saw him again. Two days later, they learned from police that he had been murdered.

## G. Testimony About the Police Investigation

Eight current and former Pittsburg police officers testified, including the two homicide inspectors who led the investigation. The forensic pathologist who performed the autopsy on Merrill and a Contra Costa County deputy sheriff who worked at the jail where Price was housed prior to her trial also testified. This testimony established the following facts.

Police were summoned by Jamie Volberding to Marina Walk Park in the early morning hours of November 3, 2009. There they found the lifeless body of a young man, later identified as Merrill, lying in a fetal position, shot through the chest. They found no wallet, cell phone or indicia of the man's identity, and no gun or (apart from Merrill's wounds) evidence of gunfire. An autopsy showed Merrill died from a bullet that went through his chest and out his back.

The investigation led to Merrill's roommates, who gave accounts of Merrill's activities on the night of his date and of his iPhone. Police obtained phone records for the phone from AT&T, which indicated that prior to the homicide it was in the San Francisco area and then moved eastward into Pittsburg. While moving eastward, it was used to call a number for a phone owned by Edosa more than 20 times. Police observed a red Honda Civic was frequently parked at Edosa's residence that was registered to Fells.

Police also learned that after Merrill's body was discovered, the iPhone was active and moved toward the Richmond/Pinole area. In the first days after that, it was not

13

active. It was then taken off AT&T's service, unlocked at a Payless Wireless, and re-activated with a new phone number via T-Mobile by "Latifa Hairston."[6] Surveillance video from the T-Mobile store where the phone was re-activated showed that Hairston was in fact Brown. The phone was later in the area of a home owned by Price's mother and was used to call phones belonging to Price's mother and Brown.

On November 12, 2009, police traced the phone to the Sun Valley Mall in Concord, where they observed that Price was in possession of the phone and using it continuously. They apprehended Price, Brown and a third woman named Laurie Bardell at the mall and confirmed from the iPhone's identification number that it was Merrill's. Despite having possession of it, Price did not claim the phone. Brown claimed the phone was hers, although she had another cell phone.

Police placed Brown and Bardell in the back of a police car and recorded their conversation. They mentioned "Kendra," Fell's given name, several times. Bardell asked Brown why she claimed the phone was hers, and Brown said she had "switched" the phone. Later, Bardell told police the iPhone belonged to Price, not to Brown.

Police also searched Price's and Brown's residences. At Price's home, they found a .45-caliber magazine and a nine-millimeter cartridge, but no firearms. At Brown's residence, they found a receipt from Payless Wireless and an iPhone charger.

Police made images of all the data on the iPhone. The phone contained 21 contacts with corresponding phone numbers, including for "Kenny Bo" and "Tipabanga," nicknames for Fells and Brown respectively. There was no contact for Price's given name (Kiarra) or nickname (Kiki). The phone contained more than 500 text messages, including those between Fells and Price that we have discussed. The phone also contained photographs of Brown's young daughter, Kamayla.

The police investigation led to questioning of Fells, Edosa and the Dardens, the arrest of Fells and the arrest and release of Edosa. Also, on December 1 or 2, 2009, one

---

[6] The owner of an "unlocked" cellphone can arrange to reprogram and use the phone via a different cellular network provider. The phone's stored data is erased when the phone is reprogrammed.

14

of the investigators learned a written communication, or "kite," had been intercepted at the jail that housed Price and Brown. A prisoner indicated she had seen her cell mate, who was Price, writing a letter that appeared to be the kite. Written in jargon and code, it appeared to tell someone what to tell investigators about an alleged murder involving a phone and activities in San Francisco, and what to tell the court and a public defender to reduce the risk of lengthy prison sentences and avoid convictions for premeditated murder.[7]

---

[7] The "kite" included the following:

"[W]e in dis mutha fucka cuz yo stupid ass bitch u the one who wanted 2 get on blud bitch I told yo dumb ass no but now u didn't wanna fuckin listen!! U the one who was like keep the punk ass phn they can't trace it I was tryna get rit of it but na u wanted 2 keep it!! Bitch I told u I should of knocked barney dwn but here yo stupid ass go again talkn bout na don't do that it ain that serious!! Bitch I told u bout manage car n u was like na they prolly watchn n looked what happened Bitch everthang I said they was gone to happened bitch.

"I been doin dis shit n not getn caught up bitch . . . . But like I said they aint got enough evidence 2 fuck wit us They really got 2 proove a murder n they need everythang n we good even if Barney snitch its gone b her word against ours so if she aint sayn the same shit we sayn that's on her she the one that's gone to lookn dumb so I aint worried bout her Im just focused on me n u!! As long as we sayn the same thang we gud!!! We mite b in dis mutha fucka for a year or two but its all worth it!! But dis is what Im gone tell my p.d. tho cuz we did go thru fast track so we was on camara so Im gone say we was in the TLs grindn n a knocked came 2 me wit a phone so I bout it they gone say y u said u wasn't in the city n Ima b like cuz I didn't wanna tell yall I be in the TLs grindn cuz I was scared 2 catch a drug charge so that's y I lied about goin 2 the city cuz I thought yall was on me bout some d[missing] Then me n my gurl went home (Rich) whn my bu[missing]as gone around 1 or 2 then the next morning we went 2 go get the shit unlocked!! That's the story we stickn 2 cuz I mean shit that's wut we really did n u gone tell yo p.d the samethang but u gone b like u was in the car while I was grindin n u would get out only whn I wanted 2 walk around the L's [cross out] n yo reason 4 not sayn that n the first place cuz u didn't want them 2 get me 4 no drug charge n was scared so that's wut we hollin n sticken 2!!! O yea I hope u b rpin up thease letters 2 n they watchn us so we gone have 2 b coo cuz I dnt wnt them 2 get us on some premadatated shit!!!

[¶] . . . [¶]

"our p.d [missing]ne try 2 make us turn on each other but don't fall for it But man I lov u blud Im gone!!! Member wut the [missing] Is n that's wut we stickn 2!! I love u

15

## H.  Jury Instructions

The court instructed the jury on premeditated murder and felony murder theories, including aiding and abetting, and conspiring to commit these offenses.  It also instructed on the special circumstance of murder committed in the course of a robbery, robbery, aiding and abetting robbery, attempted robbery, and the special firearm enhancement allegations.

## I.  The Verdict and Sentencing

After more than three days of deliberations, the jury found Price guilty of first degree murder, found true the special circumstance that the murder was committed while she was participating in the robbery of Merrill, and found not true the special allegations that in the commission of the murder Price intentionally and personally discharged a firearm and that she caused great bodily injury or death to Merrill.  The jury also found Price guilty of robbery, but found not true the special allegations that in the commission of the robbery she personally used a firearm, intentionally and personally discharged a firearm, and caused great bodily injury and death to Merrill .

In December 2013, the court sentenced Price to life in prison without the possibility of parole for the first degree murder conviction and to a concurrent five-year term for the robbery conviction, which it stayed under section 654.

---

pooh bear lol ☺ But quit plyn wit me blud!! Tell Kamya I love her n miss her n I want her 2 come 2 my house 2 lol!!

[¶] . . .[¶]

"Rip Dis Shit UP!!!"

Police testified that "grindin" is slang for selling drugs, "TL" a reference to San Francisco's Tenderloin, and "P.D" a reference to a public defender or defense attorney. There was no one related to the case named "Barney."  Because a popular rap singer is named Nicki Minaj, the reference to "manage car" could be code for Nicky Darden's car. The statement "Tell Kamya I love her n miss her" apparently refers to Brown's daughter, Kamayla.

## III.

### *Brown's Second Plea Agreement*

After Price was convicted, the People reached another plea agreement with Brown, but one less favorable to her than the one they revoked after her testimony at the preliminary hearing.

## DISCUSSION

## I.

### *The People's Prosecution of Price for First Degree Murder While Agreeing to Fells's and Browns' Pleas to Voluntary Manslaughter Did Not Violate Due Process.*

Price's primary argument is that the People's prosecution of her for murder is both legally and factually irreconcilable with their agreement that Fells and Brown committed voluntary manslaughter, thereby violating Price's rights to procedural and substantive due process. We disagree.

### A. The People's Pursuit of Murder Against Price and Voluntary Manslaughter Against Fells and Brown is Not Legally Irreconcilable.

According to Price, the voluntary manslaughter judgments against Fells and Brown are "legally irreconcilable with a finding [Price] conspired with or aided someone who shot Merrill with malice aforethought, express or implied, as required under any of the theories of murder advocated to [Price's] jury." By agreeing to these judgments, Price asserts, the People acknowledged "that [Merrill] was shot either because the shooter held an honest but unreasonable belief in the need to protect herself or another from deadly force, or because the shooter was provoked during a sudden quarrel or by the heat of passion." This is incorrect.

### 1. *Malice Murder and Voluntary Manslaughter Are Not Legally Irreconcilable.*

Section 192 defines "[m]anslaughter" as "the unlawful killing of a human being without malice" and states "[i]t is of three kinds." Subdivision (a) sets forth one kind: "[v]oluntary—upon a sudden quarrel or heat of passion."[8] As Price points out, a defendant "is guilty of voluntary manslaughter in 'limited, explicitly defined

_____

[8] Subsections (b) and (c) of section 192 describe involuntary and vehicular manslaughter, neither of which is relevant here.

17

circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87–88 (*Blakeley*).)

The People take issue with Price's premise, which they describe as "the assertion that it is impossible under California law to establish manslaughter without establishing provocation or unreasonable self-defense." They argue that in *People v. Rios* (2000) 23 Cal.4th 450 (*Rios*)—decided within weeks of *Blakeley*—our Supreme Court rejected this premise. In *Rios*, the Supreme Court recognized that if murder is charged, a trial court must instruct on the lesser included offense of voluntary manslaughter if there is evidence of provocation or imperfect self-defense, but a court is not required to do so if there is not. (*Rios*, *supra*, 23 Cal.4th at p. 463, fn. 10.) However, where voluntary manslaughter only, and not murder, is charged, "the prosecution is not further obligated to prove that the defendant was provoked or acted in an unreasonable effort at self-defense, thereby negating the possibility that the greater inclusive offense of murder was committed." (*Ibid*.) The People rely on reasoning in *Rios* which indicates that facts that would support a conviction for "the greater included offense" of murder necessarily allow conviction of the "lesser" offense of voluntary manslaughter. (*Ibid*.) In the People's view there is no inconsistency between charging Fells and Brown with voluntary manslaughter and charging Price with murder, because anyone who commits murder necessarily also commits voluntary manslaughter, whether or not there is evidence of provocation or imperfect self-defense.

The People read too much into *Rios*, in which there was evidence of provocation and attempted self-defense. The *Rios* court was not required to address whether in the absence of any indication of such mitigating factors, a charge of voluntary manslaughter would have been appropriate. However, this issue is alluded to in a case relied on by Price, *People v. Bryant* (2013) 56 Cal.4th 959 (*Bryant*), for the proposition that voluntary manslaughter is committed only where there is either provocation or imperfect self-defense. In *Bryant*, our Supreme Court rejected that there may be voluntary

18

manslaughter where malice is altogether lacking, and held that it requires intent to kill or conscious disregard for life. (*Id.* at p. 968.) It described "the offenses that constitute voluntary manslaughter—a killing upon a sudden quarrel or heat of passion [citation], a killing in unreasonable self-defense [citation], and, formerly, a killing committed by one with diminished capacity" as "united by the principle that when a defendant acts with an intent to kill or a conscious disregard for life (i.e., the mental state ordinarily sufficient to constitute malice aforethought), other circumstances relating to the defendant's mental state may preclude the jury from finding that the defendant acted with malice aforethought." (*Id.* at pp. 969–970.)

Whether the mitigating factors associated by statute and case law with voluntary manslaughter are necessarily implied in a plea agreement to that offense, as Price suggests, or entirely dispensable and therefore not implicated in such a plea, as the People contend, is not definitively answered by either *Rios* or *Bryant*. But these cases and no doubt myriad others provide indirect support for another, perhaps obvious, proposition: prior to trial, the evidence available to the People in a particular case may support both a malice murder theory and a voluntary manslaughter theory. In both *Rios* and *Bryant*, a single defendant was charged with malice murder and voluntary manslaughter as alternative theories. In other words, the possibility, particularly given that prior to trial the prosecution is not privy to all the evidence the defense might present, that there may be evidence of provocation or imperfect self-defense does not preclude the prosecutor from charging and trying the defendant on alternative theories of *malice* murder and voluntary manslaughter. The fact that the People routinely charge both offenses strongly suggests that malice murder and voluntary manslaughter are not inherently legally inconsistent. And indeed, they are not. Voluntary manslaughter is a lesser included offense of murder, both require intent to kill or conscious disregard for human life (*Bryant*, *supra*, 56 Cal.4th at pp. 968, 970), and the only difference between them is whether the defendant can prove the mitigating facts of provocation or unreasonable self-defense. As the *Rios* court observed, "[t]he possibility that the defendant killed with malice, and thus committed the greater offense of murder, does not prevent a conviction

19

of voluntary manslaughter, a lesser included offense which does not require proof of malice." (*Rios*, *supra*, 23 Cal.4th at p. 463.)

### 2. *Felony Murder and Voluntary Manslaughter Are Not Legally Irreconcilable.*

Unlike this case, neither *Bryant* nor *Rios* involved felony murder. Felony murder differs from both malice murder and voluntary manslaughter in significant ways. It entails commission of an inherently dangerous felony, requires no proof of intent or conscious disregard of life, and renders irrelevant defenses that mitigate malice such as provocation or self-defense. (*People v. Robertson* (2004) 34 Cal.4th 156, 165, overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1197–1201; *People v. Loustaunau* (1986) 181 Cal.App.3d 163, 170.) Voluntary manslaughter thus is not a lesser included offense of felony murder. (See *Loustaunau*, at p. 170 [trial court properly limited instruction on voluntary manslaughter as lesser included offense to murder theories other than felony murder].)

Here, Fells and Brown both pled guilty to robbery and involuntary manslaughter, which Price insists is inconsistent with her prosecution for robbery and murder. We start from the premise that it is legally possible for a person (such as Fells or Brown) to have committed a felony and an intentional homicide without necessarily having committed felony murder because, as the jury was instructed in this case, felony murder requires a homicide that occurs while committing or attempting to commit the felony and there must be a logical connection between the two. (*People v. Cavitt* (2004) 33 Cal.4th 187, 200–201.) Again, the prosecution may not know prior to trial all of the circumstances surrounding the commission of a felony, such as robbery, and a homicide. Thus, it is not unusual for a jury to be instructed on both theories of felony murder and malice murder (with or without the lesser included offense of voluntary manslaughter) in the same trial. (See, e.g., *People v. Friend* (2009) 47 Cal.4th 1, 55; *People v. Dillon* (1983) 34 Cal.3d 441, 462; *People v. Morgan* (2007) 42 Cal.4th 593, 616–617.)

In short, we conclude the plea agreement to voluntary manslaughter that the People made with Fells and Brown on the one hand and the murder verdict the People pursued against Price on the other are not legally irreconcilable. Therefore, Price must

establish inconsistency in the factual bases for the People's actions as the foundation for her inconsistent judgments claim. We turn our attention now to this issue.

**B. The People's Prosecution of Price for Murder After Agreeing to Fells's Plea to Voluntary Manslaughter Did Not Violate Due Process.**

**1.** *Defendant Does Not Establish the People Took Factually Inconsistent Positions with Fells and Price.*

Defendant does not establish the People took factually inconsistent positions with Fells and Price. This is because she largely disregards that we must evaluate the factual basis for the People's conduct based on what they knew when. The evidence available to the People against Fells before their plea agreement was largely circumstantial, and was significantly weaker than the evidence available to the People against Price after their plea agreement with Fells. A closer examination of this evidence indicates the People did not take factually inconsistent positions with Fells and Price.

The People's plea agreement with Fells, pursuant to which she admitted to voluntary manslaughter, robbery and supplying a weapon for commission of a felony (§ 12022), was entered into about August 2010, before a trial or even preliminary hearing had taken place. By this time, to be sure, the police had thoroughly investigated the case and interviewed numerous witnesses, but defendants were the only eyewitnesses to Merrill's shooting. Fells and Brown gave statements to police in which they admitted their involvement and said Price was the shooter, but their stories changed over time and they could not be forced to testify against themselves.

There was circumstantial evidence that Price and Brown had travelled in the Dardens' car to San Francisco and returned to Pittsburg with Merrill, but there was no evidence they had forced him to do so. Similarly, Price had possession of Merrill's iPhone prior to the homicide, but there was no evidence that she had used force to obtain it in the first instance. There was circumstantial evidence that Merrill was shot at Marina Walk Park, that Brown later unlocked and reactivated his iPhone, and that Price ended up using that phone. But there was no evidence linking the three to Merrill's missing wallet or cash. In other words, without testimony from Fells and/or Brown, the People's

21

evidence that they either robbed Merrill and killed him in the course of doing so was entirely circumstantial, and its case against Price was murky.

Moreover, the People's evidence against Fells in August 2010 suggested Fells would not be without a defense, thereby creating the risk that she would be acquitted of any or all of the offenses with which she was charged. Thus, their agreement with Fells (and their initial agreement with Brown) had two effects: it secured a conviction of Fells for which there appeared to be sufficient evidence and it strengthened the case of robbery and murder, especially felony murder, against Price.

Further, the evidence available to the People in August 2010 was significantly weaker against Fells than against Price. First, it tended to show Price had a more culpable mental state than Fells, with the result that the case against Price for malice murder was stronger. This was indicated in the text messages between Fells and Price shortly after the killing, which strongly implicated Price, and not Fells, as the shooter. Further, Price texted she knew what she was doing and that it needed to be done, tending to show she intended to kill. On the other hand, the text message conversation indicated Fells was angry with Price for shooting Merrill; coupled with Edosa's statements about Fells's reaction to what had happened upon her return home, this tended to show Fells was surprised and upset by the shooting, suggesting she did not have an intent to kill.

Second, the evidence indicated that Fells was not present with Brown and Price until moments before the shooting, and certainly not when the two went to San Francisco, got Merrill, first obtained possession of his iPhone and returned to Pittsburg with him in the back seat. This evidence included Edosa's statements and was corroborated by the repeated unanswered phone calls made from Merrill's iPhone to the phone Fells shared with Edosa.

Third, unlike Price and Brown, Fells was not found with the iPhone or any other items belonging to Merrill. Price, by contrast, used the iPhone after the homicide and was found in possession of it. She also reported to Brown's stepfather, Wilks, that she got the phone in "a little lick."

22

Fells's own statements, not surprisingly, were also self-exculpatory. She told police and later testified that she was intoxicated and asleep when Price came and suggested she "take a ride with her," did not know where they were going or what they were doing, and did not participate in the robbery or receive anything from it.[9]

Given the evidence available to the People in August 2010, Fells could plausibly have denied being part of any conspiracy or having any intent to rob *or* kill Merrill. And, while she had told police she gleaned that a robbery was afoot when they all got out of the car at the park and assumed she was expected to serve as lookout, she denied talking about any of this with the others beforehand; thus, she could have plausibly denied at trial that she intended to, agreed to or in fact did aid and abet the robbery. Had the jury believed her, she could have been acquitted of both robbery and murder.

Of course, Fells admitted to having been present at the scene. Edosa conceivably might have been persuaded to testify against Fells. And Fells had texted Price and chastised her for doing too much. Some of this evidence conceivably could have been used in a murder trial against Fells. Of course, the gun belonged to Fells, who was aware that Price brought it with them in the car on the drive to the park; but Fells did not tell the police the gun used to shoot Merrill was hers until they had tentatively entered a plea agreement, and without that agreement the People might not even have learned, much less have been able to prove, that the gun belonged to Fells.

Indeed, as the People point out, "it was wholly within the realm of possibility that Fells could claim that no robbery was ever intended, that the four occupants of the car were all on wonderful terms until the last moment, and that, at minimum, a sudden quarrel resulted in a provoked shooting, or in a shooting in unreasonable self-defense."[10]

---

[9] Brown testified at the preliminary hearing that she and Fells had divided money from Merrill's wallet between themselves. But it is not clear that Brown said this before the hearing, and she appears to have entered into her first plea agreement before the hearing, close in time to Fells's agreement.

[10] Indeed, Fells's testimony at the preliminary hearing hinted at provocation and imperfect self-defense theories. She said at the park Merrill was drunk and "talkin'

23

Had Fells done so, given her denial of involvement in the robbery and the lack of direct evidence tying her to it, it was possible that a jury would have found her guilty at best of voluntary manslaughter. However, such a defense was considerably less likely to assist Price because of the evidence that she robbed Merrill. That made her vulnerable to a conviction for felony murder, for which provocation or imperfect self-defense would not provide any mitigation. By entering the plea agreement with Fells, the People secured a homicide conviction against Fells as well as a robbery conviction. They also obtained Fells's eyewitness testimony, which corroborated what was otherwise a circumstantial evidence case that Price intended to and did rob and kill Merrill.

There is a tension between Fells's admission to robbery and supplying a weapon during commission of a felony, on the one hand, and to voluntary manslaughter, on the other. However, it is possible to conceive of a scenario in which these offenses make sense together based on the evidence and risk known to the People in August 2010. If, for example, Fells had provided the gun to Price when she first came to Edosa's house knowing Price intended to rob someone, and Price had used the gun to rob Merrill of his iPhone, and if there had been no further robbery at the park, Fells could be convicted of robbery and supplying a weapon without being convicted of felony murder. And if Fells then accompanied Price and Brown to the park expecting they would just leave Merrill there and Merrill had then been shot in imperfect self-defense, there could also be voluntary manslaughter. To be sure, this is speculative, but many specifics about what happened were unclear in August 2010. The People could not have known precisely how the events unfolded in the early morning hours of November 3, 2009, without Fells's cooperation, and could not predict what defenses Fells or the other defendants would present at trial.

---

belligerent," meaning "drunk talk, sayin', like, all kind of crazy stuff," like " '[y]ou think you better than me?' and somethin' else and just rambling on . . . .' " As she and Brown walked back to the car, she turned around and saw Price on the ground with Merrill standing over her, and "that's when it just got hectic", that Merrill "pushed [Price] on the ground I guess," and she heard shots fired.

24

We do know the People faced significant challenges in trying Fells for malice murder, and perhaps lesser but still significant challenges in trying her for robbery and felony murder. By pleading her to a lesser count for the homicide and to robbery with the added charge of supplying the weapon, the prosecutor was entering a compromise in which he accepted reduced charges for a defendant against whom his case was weaker for certain punishment of that defendant and testimony that would strengthen his case against Price, the defendant who appeared more culpable.

Price argues that the plea agreements with Fells and Brown constituted an admission by the assistant district attorney that "any malice harbored by Merrill's shooter was mitigated by circumstances wholly inconsistent and irreconcilable with the crime of murder." By advocating that Price shot Merrill with malice, she contends, he was representing that circumstances he admitted were present in Fells's case were not present in Price's. We disagree for two reasons.

First, Price cites no case holding that a prosecutor who enters a plea agreement is admitting to a specific version of the events relating to the crime, from which he cannot vary in cases against co-defendants thereafter.[11] We find no support for this proposition, and conclude that the law supports the opposite conclusion. In *People v. Superior Court*

---

[11] The cases Price cites, *People v. Jones* (1995) 10 Cal.4th 1102, 1109 and *People v. Marlin* (2004) 124 Cal.App.4th 559, 573 hold only that a defendant who enters a plea is admitting to the essential elements of the crime and cannot thereafter raise a challenge on appeal challenging his or her guilt with respect to that crime. They do not address whether in entering a plea agreement with one defendant the district attorney is admitting that the crime occurred in a certain way or involved the same mental state on the part of all participants. Price also cites Penal Code section 1192.5, which requires a court approving a plea to "cause an inquiry to be made of the defendant to satisfy itself that the plea is freely and voluntarily made, and that there is a factual basis for the plea." The cases interpreting this requirement have held that the purpose of this inquiry is to guard against the risk that a defendant will plead to an offense that his acts do not constitute and to "ensure[] that the defendant actually committed a crime *at least as serious as* the one to which he is willing to plead." (*People v. Watts* (1977) 67 Cal.App.3d 173, 178.) Our Supreme Court has held that "[t]he factual basis required by section 1192.5 does not require more than establishing a prima facie factual basis for the charges." (*People v. Holmes* (2004) 32 Cal.4th 432, 441.)

(2010) 48 Cal.4th 1 (*Sparks*), our Supreme Court held that the acquittal of one participant in a crime does not collaterally estop the People so as to preclude them from pursuing a verdict against other participants in the same crime. (*Id*. at p. 5.) The same rule applies where one of multiple co-participants is convicted of a lesser offense; such a conviction does not bar trial of another participant for the charged offense. (See *People v. Rose* (1997) 56 Cal.App.4th 990, 992–994 [co-perpetrator no-contest plea to misdemeanor petty theft did not bar prosecution of defendant for felony second degree burglary and felony petty theft].)

Second, the People's plea agreement with Fells gave them significant additional evidence that they would not have had to use against Fells, but could use against Price. As the court noted in *Sparks*, "sometimes evidence is available in one case against one defendant that is not available in another case against another defendant." (*Sparks*, *supra*, 48 Cal.4th at p. 11; see also *People v. Wilkins* (1994) 26 Cal.App.4th 1089, 1095–1096 [where aider and abettor's confession admissible against him but not perpetrator, acquittal of perpetrator did not collaterally estop prosecution from convicting aider and abettor].) Certainly, that is the case here. And Fells's eyewitness testimony indicating that Price robbed and killed Merrill at the same time in the park strengthened the People's previously circumstantial case against Price. In short, we conclude the People's factual basis for their plea agreement with Fells was not factually irreconcilable with their factual contentions against Price, but simply was different.

### 2. *Any Factual Inconsistency in the People's Positions with Fells and Price Was Justified by the Different Evidence and Risk at the Time of Fells's Plea and Price's Trial.*

Even if the People took factually inconsistent positions in Fells's plea agreement and at Price's trial, they were justified in doing so.

Price, of course, argues otherwise, relying most heavily on *In re Sakarias* (2005) 35 Cal.4th 140 (*Sakarias*), the seminal (and most recent) California Supreme Court exposition of the law governing due process challenges based on inconsistent judgments. There, two habeas petitioners, each convicted of first degree murder and sentenced to

26

death for their joint attack on the same victim, argued their prosecutor used factually inconsistent theories in their separate trials in violation of their due process rights. (*Id.* at pp. 144–145.) The evidence showed both had participated in the fatal attack, perpetrated with a hatchet and a knife. (*Id.* at p. 144.) Both complained that the prosecutor "inconsistently and falsely portrayed their respective roles in the attack, attributing to each, in their respective trials, a series of three blows struck to the victim's head with the blade of the hatchet." (*Id.* at pp. 144–145.) By doing so, the prosecutor was able to "establish an aggravating circumstance of the crime (§ 190.3) on the basis of which the jury was urged to sentence each defendant to death." (*Id.* at p. 160.)

The *Sakarias* court held that the prosecutor prejudicially violated Sakarias's due process rights by intentionally and without good faith justification attributing to both defendants acts that could only have been committed by one person, who likely was petitioner Waidla. (*Sakarias*, *supra*, 35 Cal.4th at p. 145.) In other words, "[b]y intentionally and in bad faith seeking a conviction or death sentence for two defendants on the basis of culpable acts for which only one could be responsible, the People violate 'the due process requirement that the government prosecute fairly in a search for truth . . . .' " (*Id.* at p. 160.) *Sakarias* thus did not hold that inconsistent factual contentions by a prosecutor in separate cases against defendants who participated in a common crime necessarily present a due process problem. (See *id.* at p. 162.) Rather, the court held only that "the People's use of irreconcilable theories of guilt or culpability, *unjustified by a good faith justification for the inconsistency*, is fundamentally unfair, for it necessarily creates the potential for—and, where prejudicial, actually achieves—a false conviction or increased punishment on a false factual basis for one of the accuseds." (*Id.* at pp. 159-160, italics added; see *id.* at pp. 157–159.)

Further, the *Sakarias* court observed that "a significant change in the available evidence might, under some circumstances, warrant the use of an inconsistent prosecutorial theory in a subsequent trial." (*Sakarias*, *supra*, 35 Cal.4th at p. 162.) The court distinguished between a change in the evidence available and a "deliberate strategic choice" to "manipulate[e]" the evidence, as occurred there, so as to attribute to two

27

defendants, and thereby increase the punishment for both, acts that could only have been committed by one. (*Ibid.*) It also held that a defendant is entitled to relief only if the inconsistency prejudiced him—at least where the probable truth of the situation can be determined. (*Id.* at p. 164.) The court thus held Sakarias was entitled to relief but Waidla was not, since the evidence indicated Waidla was the killer. (*Id.* at pp. 165, 167, fn. 9, 168.)[12]

*Sakarias* establishes three elements must be present before an inconsistency in a prosecutor's contentions against persons who jointly commit criminal acts will rise to the level of a due process violation: (1) the prosecution used inconsistent and irreconcilable theories either to convict or obtain a harsher sentence; (2) the inconsistency is not justified by a good faith reason; and (3) the inconsistency achieved a false conviction or increased punishment based on false factual assertions for one of those accused.[13]

Here, Price contends there was misconduct because "the District Attorney had all the evidence to prosecute all three women for whatever offense he believed they committed when he made the deal with Fells." This is inaccurate in at least two respects: first, as we have discussed, the case was largely circumstantial until the plea agreement

---

[12] As to Waidla, the court did not reach whether his rights had been violated, instead holding that any such violation was harmless. (*Sakarias*, *supra*, 35 Cal.4th at p. 145.)

[13] There are some differences between *Sakarias* and this case that the parties do not address. The first is that *Sakarias* addressed a habeas petition, not a direct appeal. In an earlier opinion on the petitioner's direct appeal, the California Supreme Court declined to address the due process claim, stating that the issue "is better decided on a petition for writ of habeas corpus than on direct appeal," at least where "the asserted inconsistencies in prosecutorial theory were not the subject of any proceeding in the trial court and, hence, neither the inconsistencies nor any explanations the prosecutor may have been able to offer appear in the appellate record . . . ." (*People v. Sakarias* (2000) 22 Cal.4th 596, 635.) Here, the People do not contend we should decline to address Price's due process claim on appeal. We see no reason not to address the claim, particularly because the evidence available to the People at all relevant times can be gleaned from the record. Both parties also assume the *Sakarias* analysis, although regarding the People's conduct in separate trials, also applies to its conduct regarding plea agreements claimed to be inconsistent with its conduct in a trial. We see no reason not to apply it and, therefore, do so here.

with Fells was made, at which point the prosecution had direct evidence in the form of Fells's testimony; and second, the evidence about what happened the night of the killing was to some extent inchoate.

Price further argues that "[i]f the evidence showed Merrill was killed in a sudden quarrel or in unreasonable self-defense as the prosecutor represented to the court seeking approval of Fells's plea, then using Fells's willingness to inculpate appellant for first degree robbery murder was an abuse of executive power." The People's conduct, Price claims, "manipulated evidence, coopted the judiciary and vitiated the truth-finding aspect of the trial process, turning it into a costly game of chess." Again, we disagree. The evidence the prosecutor had at the time of Fells's plea agreement did not definitively establish only one crime or set of crimes to the exclusion of all others for all defendants. There was evidence that could support criminal charges on multiple theories depending on the defendant, and precisely how that evidence would come in at any trial was not entirely knowable. For example, the evidence indicated that the roles and mental states of the defendants were not necessarily the same. Thus the entry of a plea agreement with Fells on one theory followed by a trial of Price on another theory does not prove "manipulation" or other prosecutorial misconduct.

This case is nothing like *Sakarias*, in which at the trial of the second defendant the prosecutor withheld evidence he had offered at the trial of the first defendant so as to convince both juries that their defendant and not the other had delivered the fatal blows. Notably, Price does not claim the People withheld evidence from her trial. For example, she does not contend the evidence supported a defense of provocation or self-defense, or that the prosecution believed it did. Indeed, Price made no attempt to assert such a defense theory, and her counsel specifically disavowed self-defense. Nor did she request an instruction on voluntary manslaughter as a lesser included offense of malice murder. As *Rios* indicates, it was not the People's burden to assert or prove provocation or self-defense, it was defendant's, and Price made no attempt to do so.

Nor has Price demonstrated that the People knowingly proffered false evidence at her trial. She implies that Fells's trial testimony was false or used unfairly because it

29

conflicted with her plea and "unfairly persuaded appellant's jury of an unreliable verdict in violation of her right to due process." This is incorrect. As we have discussed, both voluntary manslaughter and murder involve intentional killing or killing in conscious disregard of life. Further, the evidence against Fells at the time of her plea agreement indicated a robbery could have occurred without there being felony murder. As we also have discussed, the People did not by entering into that plea agreement concede Merrill was killed with provocation or in imperfect self-defense or that there was no robbery (or that Fells did not participate); rather, the plea agreement was an acknowledgement that Fells might convincingly assert such defenses on her own behalf.[14]

Given the absence of inconsistency and of prosecutorial misconduct, we reject Price's claim of prosecutorial misconduct related to the People's plea agreement with Fells.

## C. The People's Prosecution of Price for Murder and Agreement to Brown's Voluntary Manslaughter Plea Did Not Violate Due Process.

We turn now to Brown's second plea agreement, which was made after Price's trial. Even then, the People's case against Brown, for different reasons than Fells, was less strong than the case against Price and not necessarily inconsistent. There was no evidence indicating Brown was the shooter or connecting her to the gun used to kill Merrill. And nothing indicated Brown was aware either that Fells owned a gun or that Price had brought one to the park. The absence of evidence showing Brown was aware

---

[14] To the extent Price is suggesting that use of Fells's testimony violated due process because her credibility was questionable in light of her plea, that is foreclosed by California cases holding a defendant is not denied a fair trial because an accomplice testifies in exchange for reduced charges, a lesser sentence or immunity, so long as the jury is apprised of the plea bargain and can evaluate the accomplice's credibility. (See, e.g., *People v. Lyons* (1958) 50 Cal.2d 245, 265, abrogated on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 30–34.) Lesser charges or reduced sentences for accomplice testimony "furnish the defendant with a powerful weapon for attacking the credibility of the inherently suspect witnesses," but such inducements "go to the credibility, not the competency, of the accomplices' testimony," and where the jury is apprised of the inducements it cannot be said the trial court "is unfair in fact or in law." (*Lyons*, at p. 265.) Price's jury indisputably was so apprised here.

of the gun made it less likely she could be convicted of malice murder (including aiding and abetting or conspiracy to murder). Further, unlike Price, whose text messages to Fells provided grounds for inferring intent to kill, the People's case against Brown on the felony-murder special circumstance was less compelling.

On the other hand, the felony murder case against Brown was fairly strong. Besides Fells's testimony implicating Brown in the robbery at the park in which Merrill's wallet was taken,[15] there was corroboration in the testimony of Nicky Darden and her family members that Darden loaned Brown the Darden family's car on the night before the murder and that Brown returned it (with Price in tow) on the morning of the murder. There was also corroboration from Edosa, who testified that Brown was in the driver's seat before the trip to San Francisco and before and after the trip to the park. Perhaps most significantly, it was Brown who arranged to unlock Merrill's iPhone and set up a new account for it with T-Mobile, a photograph of Brown's daughter was found on the iPhone and police found an iPhone charger at Brown's residence. Also, Brown originally told police the iPhone was hers, and Price's kite suggests Brown was the one who insisted on keeping it. While the evidence also indicated that Price was the primary user of the phone, a jury could have found that she and Brown stole it with the intent to share it. If the evidence at Brown's trial were similar to the evidence at Price's trial, it would have been challenging for Brown to deny involvement in the robbery of Merrill and thereby avoid a felony murder conviction.

But, as the People point out, there was no certainty that all of the same evidence presented against Price would have been available at a trial of Brown, or that the testimony, especially of Fells, would have been as strong. Fells had originally sought to protect Brown, with whom she had a prior romantic relationship. She initially told police that only she and Price were at the scene of the robbery and murder. Although she

---

**15** We omit discussion of Brown's statements and preliminary hearing testimony both because the statements are not in the record and because there were questions whether those statements, as well as her preliminary hearing testimony (which is in the record), could be used against her at her trial given the immunity agreements between her and the prosecution.

testified otherwise at Price's preliminary hearing and trial, it is possible she might have testified differently in a trial against Brown, such as by denying Brown's participation in the robbery, claiming the shooting was provoked or committed in unreasonable self-defense or claiming not to remember specifics of what happened. Moreover, the Price jury's rejection of enhancement allegations that Price personally used a firearm in the crime indicated it had doubts about Fells's credibility, which the People could reasonably have believed would hurt their case in a trial against Brown. And, while it is unlikely, Brown herself might have testified that the killing was done with provocation or in self-defense, even if the People called her credibility into question.

Finally, in order to convict Brown of murder, the People would have been required to invest the time and resources on a second trial with no guarantee it would be successful. That the People opted instead to avoid that uncertainty and expense by pleading Brown to a lesser set of offenses does not establish that they engaged in misconduct in trying Price for murder.

### D. Any Prosecutorial Misconduct Based on an Inconsistency Was Harmless.

Even if the People made impermissible inconsistent factual contentions in their plea agreements with Fells and Brown for voluntary manslaughter and their prosecution of Price for murder, we fail to see how Price was prejudiced.

As indicated above, under *Sakarias* a defendant challenging her judgment on grounds of due process violations stemming from inconsistency in a judgment against a co-defendant must, at least "where the probable truth of the situation can be determined," show that she was prejudiced by the presentation of false evidence at her trial leading to an unfair conviction. (*Sakarias*, *supra*, 35 Cal.4th at pp. 164–168.) Price criticizes the *Sakarias* prejudice rule, but we are bound by it. (*People v. Johnson* (2012) 53 Cal.4th 519, 528 (*Johnson*).)

The evidence of felony murder at Price's trial was very strong. There was ample evidence that Price committed a robbery in the course of which Merrill was killed. There was also evidence, including her text messages to Fells, that she committed malice murder, either as the shooter or as an aider and abettor. Indeed, even though Price and

32

her counsel were present for her preliminary hearing and heard Fells's testimony there, Price's trial counsel made no effort to elicit testimony supporting a provocation defense, expressly disavowed any theory of self-defense, and did not request a voluntary manslaughter instruction. Thus, if the People did err, and we do not suggest they did, it was not in trying Price for murder but rather in allowing Fells and/or Brown to plead guilty to voluntary manslaughter. Any such error may have benefited Fells and/or Brown, but it did not prejudice Price. For this reason, too, Price's due process arguments must all be rejected.

## II.

### *The People's Pursuit of the Uncharged Conspiracy Theory of Felony Murder Was Consistent with California Law.*

The People argued and the trial court instructed the jury that if Price conspired to commit murder, or conspired to commit a robbery in which a murder was committed as a natural and probable consequence in furtherance of that conspiracy, Price could be found guilty of murder, including first degree murder. Price does not take issue with the articulation of the theory in the instructions, which we therefore need not set forth. Instead, she argues that the People's pursuit of the conspiracy theory and the giving of the instructions were erroneous "because in California only a principle [*sic*] in an offense can be prosecuted for it, and absent a *charge* of conspiracy (Pen. Code, § 182),[16] an individual who is no more than a co-conspirator is not a principle [*sic*] in any charged offense."

Specifically, Price argues that section 31, which provides in relevant part that "[a]ll persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed" (§ 31), does not address

---

[16] Section 182 makes it a crime to conspire with one or more other person to commit any crime and provides that a conspiracy to commit a felony is, in most instances, "punishable in the same manner and to the same extent as is provided for the punishment of that felony."

33

conspirators. Further, her argument goes, under section 971, which allows all persons who by operation of other sections are principals to be prosecuted and punished as principals without factual allegations beyond those required against a principal,[17] "[o]nly those defined as principals by section 31 may be 'prosecuted, tried and punished as principals.' "

As the People put it, "[t]he argument is a non-starter" because it rests on the premise that we need not follow California Supreme Court decisions stating a contrary rule, including two of recent vintage: *People v. Valdez* (2012) 55 Cal.4th 82, 149–150 (*Valdez*) and *People v. Lopez* (2013) 56 Cal.4th 1028, 1071–1072 (*Lopez*). Price describes these cases as "assum[ing] without analysis that uncharged conspiracy is a principle of criminal liability." She argues that the earlier decisions on which *Valdez*, at least, relies, do not address the issue of whether there is "statutory authority for uncharged conspiracy liability." She also contends that earlier, in *People v. Durham* (1969) 70 Cal.2d 171, the Supreme Court "expressly reasoned uncharged conspiracy was not a separate theory of criminal liability." In Price's view, subsequent decisions have "glossed over the distinctions recognized in *Durham* and attribute a broad proposition to cases not contained in them"; "[t]here being no reasoned holding that uncharged conspiracy is statutorily authorized, this court may address the question without constraint. (*Grange Debris Box & Wrecking Co. v. Superior Court* (1993) 16 Cal.App.4th 1349, 1358 [[courts] not bound by Supreme Court dictum unless it 'demonstrates a thorough analysis of the issue or reflects compelling logic.'].)"

We need not venture down the treacherous path Price invites us to travel of scrutinizing our Supreme Court's analysis in *Valdez* and *Lopez* for " 'thorough[ness]' " or " 'compelling logic' " for the simple reason that the court's decision in *Valdez* is not

<hr>

[17] Section 971 provides: "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, who by the operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals and no other facts need be alleged in any accusatory pleading against any such person than are required in an accusatory pleading against a principal."

dictum.  In that death penalty appeal, the defendant argued that the trial court erred in "grant[ing] the prosecution's request to present evidence of a conspiracy even though the indictment did not allege a conspiracy, and . . . [in] instruct[ing] the jury on the law of conspiracy."  (*Valdez*, *supra*, 55 Cal.4th at p. 149.)  The defendant argued—just as Price argues here—that "under the statutory definition of principal (§ 31), 'participation in a conspiracy alone is not an authorized basis for finding a person guilty of any offense other than conspiracy, a crime also defined by statute.  (§ 182.)' " (*Id*. at pp. 149–150.)  The Supreme Court rejected the argument, finding it "unpersuasive," and stated that its prior decisions "have 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator.  [Citations.] "Failure to charge conspiracy as a separate offense does not preclude the People from proving that those substantive offenses which are charged were committed in furtherance of a criminal conspiracy [citation]; nor, it follows, does it preclude the giving of jury instructions based on a conspiracy theory [citations]." [Citation.]' " (*Id*. at p. 150.)  And the *Valdez* court declined the defendant's invitation to reexamine its prior decisions.

In short, the Supreme Court has spoken on the subject, its decision is a holding, and we are bound to follow it.  (*Johnson*, *supra*, 53 Cal.4th at p. 528.)  The People were entitled to pursue their conspiracy theories against Price.

### III.

### *The Robbery-Murder Special Circumstance Instruction Is Not Unconstitutionally Vague.*

Price next claims the court committed instructional error regarding the robbery-murder special circumstance allegation that the jury found true.  Again, we disagree.

The district attorney alleged the felony-murder special circumstance in subdivision (a)(17)(A) of section 190.2 against Price, rendering Price vulnerable to a sentence of life without possibility of parole if she were found guilty of first degree murder.  Section 190.2, subdivision (a)(17)(A) governs a murder committed "while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit"

35

robbery. For this special circumstance to be found true where the defendant is not the actual killer, subdivisions (c) and (d) require the prosecution to prove that the defendant (1) either had the "intent to kill" (§ 190.2, subd. (c)), or (2) acted with "reckless indifference to human life and was a major participant" in the robbery (*id.*, subd. (d)). The Price jury was so instructed. The court further instructed that "[a] person *acts with reckless indifference to human life* when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death."

Price argues that section 190.2, subdivision (d) and the court's instruction violate due process because the first required element for a non-killer, that she be a "major participant" in the felony, is not defined in either and the term does not provide adequate guidance to the jury. She also argues that the second required element, reckless indifference to human life, is imputed in felony murder and therefore fails to "guide prosecutors or juries in differentiating between those eligible for life without possibility of parole and those for parole [*sic*] remains a statutory possibility." Price also contends that the failure to draw clear distinctions between the parole and no-parole types of crimes violates equal protection because she "was similarly situated with others convicted of first degree felony murder in that she was found guilty of the murder as a co-felon who acted with reckless indifference to the risk to human life without having actually killed the victim."

Neither party provides an adequate discussion of the legal standards governing due process or equal protection challenges in this context. We find helpful recent discussion by our Supreme Court grappling with the prohibitions in the Eighth and Fourteenth Amendments of the federal Constitution against a sentence of death imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. "To satisfy this constitutional command, 'the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. [Citations.] . . . [T]he aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants

36

convicted of murder.  [Citation.]  Second, the aggravating circumstance may not be unconstitutionally vague.' (*Tuilaepa v. California* (1994) 512 U.S. 967, 972.)  The lying-in-wait special circumstance is an 'aggravating circumstance[]' subject to these constitutional requirements." (*People v. Johnson* (1916) 62 Cal.4th 600, 634–635.)

Discussing the first requirement that special circumstance aggravating factors listed in section 190.2 apply only to a subclass of defendants convicted of murder, the court said in *People v. Beames* (2007) 40 Cal.4th 907 that section 190.2 " 'does not fail to perform the constitutionally required narrowing function by virtue of the number of special circumstances it provides or the manner in which they have been construed.' . . . Because the special circumstances listed in section 190.2 apply only to a subclass of murderers, not to all murderers [citation], there is no merit to defendant's contention . . . that [section 190.2] is impermissibly broad." (*Beames*, at pp. 933–934)

Addressing the second requirement, that the circumstance not be too vague for the jury to apply, the United States Supreme Court has provided the following guidance: "Because 'the proper degree of definition' of eligibility and selection factors often 'is not susceptible of mathematical precision,' our vagueness review is quite deferential. [Citations.]  Relying on the basic principle that a factor is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding,' [citation], we have found only a few factors vague, and those in fact are quite similar to one another." (*Tuilaepa v. California*, *supra*, 512 U.S. at pp. 973–974.)

Insofar as Price argues that section 190.2 or the court's instruction is too vague to provide sufficient guidance to the jury, our Supreme Court has rejected such an argument in *People v. Estrada* (1995) 11 Cal.4th 568 (*Estrada*).  There, the court entertained and rejected an argument that the phrase "reckless indifference to human life" in section 190.2, subdivision (d) is unconstitutionally vague. (*Estrada*, at pp. 580–581.)  The court held that "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.  This is the meaning intended by the phrase 'reckless indifference

37

to human life' as it is used in section 190.2[, subdivision](d), and as defined in *Tison* [*v. Arizona* (1987) 481 U.S. 137 (*Tison*)].[18]  The phrase therefore does not have a technical meaning peculiar to the law, and the trial court had no sua sponte duty to further define the statutory phrase for the jury." (*Id*. at p. 578.)  If a request for further instruction on the meaning of the term was requested, the court held, the trial court should instruct the jury that "reckless indifference to human life" means "knowingly engaging in criminal activities known to carry a grave risk of death." (*Id.* at p. 580.)

Here, the trial court used language almost identical to that suggested in *Estrada*.  It defined "reckless indifference to human life" as "knowingly engag[ing] in criminal activity that he or she knows involves a grave risk of death."  Thus, the reckless indifference to human life standard, especially as defined by the trial court in its instruction, is one that a jury may reasonably be expected to understand.

Neither Price nor the People cite any California Supreme Court decision addressing whether the phrase "major participant" is too vague to provide adequate guidance to a jury.  However, the People cite a Third District decision, *People v. Proby* (1998) 60 Cal.App.4th 922 (*Proby*).  There, the defendant argued the court should have provided an instruction that defined major participant to mean " 'one such as the ringleader or the actual killer whose participation was greater in importance than that of the other participant[s].' " (*Id*. at p. 932.)  The court disagreed with that proposed definition as "too narrow." (*Id*. at p. 934.)  It observed that the definition relied "on the common dictionary meaning of 'major' as 'greater in dignity, rank, importance, interest, number, quantity or extent,' " but observed that "the common dictionary meaning of 'major' also includes 'notable or conspicuous in effect or scope' and 'one of the larger or more important members or units of a kind or group.' " (*Ibid.*)  The court also rejected the broader proposition that an instruction was needed to define "major participant," quoting *Estrada* for the proposition that " '[w]hen a word or phrase " 'is commonly

---

**18**  In *Tison*, the United States Supreme Court held that imposing the death penalty for felony murder committed by a major participant with reckless indifference to human life does not violate the Eighth Amendment. (*Tison*, *supra*, 481 U.S. at pp. 157–158.)

understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " ' " (*Proby*, at p. 933.) It concluded that "[i]n this context . . . the phrase 'major participant' is commonly understood and is not used in a technical sense peculiar to the law. The common meaning of 'major' includes 'notable or conspicuous in effect or scope' " and " 'one of the larger or more important members or units of a kind or group.' " (*Id*. at pp. 933–934.) Given the deferential standard we must apply to claims that a special circumstance is unconstitutionally vague, we agree with *Proby* that the "major participant" element of the felony-murder special circumstance under section 190.2, subdivision (d) is sufficiently understandable to meet due process requirements.

One facet of Price's argument that neither *Proby* nor *Estrada* address is that the major participant and reckless indifference to human life standards do not distinguish the life crime of felony murder from the life without parole/death penalty eligible crime of murder with the felony-murder special circumstance. " 'Reckless indifference,' " Price argues, "is another way of describing the 'conscious disregard' necessary for [the] implied malice" that is inherent in felony murder. While malice is imputed in felony murder and need not be proven, reckless indifference to the likelihood of death "is necessarily present in *all* felony murder—even second degree felony murder." She also contends the major participant requirement could be found true of any aider and abettor in a felony murder. "In short, it is practically impossible to conceive of an aider and abettor or co-conspirator proven to have participated in the felony who would not be considered a 'major participant' for purposes of section 190.2 without resort to personal predilection." As an example, Price points out that "despite seeking judgment for voluntary manslaughter against Fells and Brown, the prosecutor here argued to the jury [that] all three women were 'major participants' for purposes of section 190.2."

The People respond that for a felony murder conviction, "actual malice is satisfied by a showing of participation in the felony. This sharply distinguishes the showing for felony murder from the showing required for the special circumstance of felony murder.

39

The special circumstance requires exactly what the substantive offense does not, that is, a showing of reckless indifference. This is a major difference, more than sufficient to perform the proper winnowing function of the special circumstance."

In our view, Price's argument that the felony-murder special circumstance fails to fulfill the required winnowing function is foreclosed by prior California cases. Our high court has repeatedly upheld section 190.2 in its entirety as meeting this requirement, even after the voters expanded the law in 1978 to include a wide array of special circumstances. (E.g., *People v. Carter* (2005) 36 Cal.4th 1215, 1278; *People v. Horning* (2004) 34 Cal.4th 871, 913; *People v. Crittenden* (1994) 9 Cal.4th 83, 155–156.) The court has also held that the felony-murder special circumstance itself meets the winnowing requirement (*People v. Boyce* (2014) 59 Cal.4th 672, 700 [and cases cited therein]), and that another special circumstance contained in section 190.2 satisfies the winnowing requirement because it requires the People to prove intent to kill, which distinguishes the special circumstance from the underlying crime. (*People v. Davenport* (1985) 41 Cal.3d 247, 271 ["The special circumstance is distinguished from murder by torture under section 189 because under section 190.2, subdivision (a)(18) the defendant must have acted with the intent to kill"].)[19] Finally, in *People v. Anderson* (1987) 43 Cal.3d 1104, 1147–1148, superseded by statute on other grounds as stated in *People v. Mil* (2012) 53 Cal.4th 400, 408–409, our Supreme Court held that "by making the felony murderer but not the simple murderer death-eligible, a death penalty law furnishes the 'meaningful basis [required by the Eighth Amendment] for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.' " If the winnowing function is satisfied by narrowing the class of those eligible for the death penalty or life without parole from all murderers to all felony murderers, a law that narrows the class of non-killer participants in a felony murder—to those who are major

---

[19] Proof of murder by means of torture, a statutorily listed type of first degree murder under section 189, does not require an intent to kill but only requires intent to torture and a deliberate and premeditated intent to cause extreme pain or suffering. (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.)

participants and acted with reckless disregard for grave risk to human life—also satisfies the standard.

After the briefs were filed in this case, the California Supreme Court issued opinions in two cases addressing the felony-murder special circumstance, *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). Prior to the date scheduled for oral argument, counsel for Price submitted a letter under Rule 8.254 of the California Rules of Court bringing these opinions to our attention. After argument we requested supplemental briefing on two issues raised by Price's citation of these cases:  (1) whether *Banks* and *Clark* establish that the trial court should have given more specific or different instructions regarding the special circumstance and if so, what further or different instructions were required, and (2) whether, in light of *Banks* and *Clark*, there is sufficient evidence in the record to support the jury's finding that the felony-murder special circumstance was true.  Having considered the parties' supplemental briefing on these points, we conclude that neither case compels a different or better jury instruction than was given in this case.

We start with a discussion of *Banks* and *Clark*.  In *Banks*, three individuals, two of whom were armed, robbed a marijuana dispensary while appellant waited outside in a car.  (*Banks*, *supra*, 61 Cal.4th at pp. 794–795.)  While trying to leave the dispensary, one of the three robbers shot and killed a security guard who was pushing the dispensary's front door closed.  (*Id.* at p. 795.)  The appellant was convicted of murder with a felony-murder special circumstance.  (*Id*. at p. 797.)  On appeal, he argued there was insufficient evidence to support the special circumstance true finding.  (*Ibid*.)  The Court of Appeal rejected his argument, but the California Supreme Court reversed.  (*Ibid*.; *id*. at p. 812.)

Interpreting section 190.2, subdivision (d) in the context of recent United States Supreme Court cases applying the Eighth Amendment, one of which was the source of the term "major participation" in section 190.2, the court in *Banks* addressed the major

participation and reckless disregard requirements.[20] With respect to the former, it concluded that "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks*, *supra*, 61 Cal.4th at p. 802.) Further, it rejected the People's argument that participation in planning with the intent of facilitating commission of the felony or participation in conduct integral to its commission constitute major participation, observing that this "would sweep in essentially every felony murderer . . . whether an actual killer or not." (*Id*. at p. 803.)

The reckless indifference requirement, the *Banks* court further held, requires that the defendant "be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, *supra*, 61 Cal.4th at p. 801.) The appellant in *Banks*, who had participated in planning the robbery but was not present at the scene when it took place, was not a "major participant" within the meaning of section 190.2, subdivision (d) (*Banks*, at pp. 805–807); nor was the evidence sufficient to support a finding that he met the reckless indifference prong of the statute. (*Id.* at p. 807.) In regard to the latter, there was no evidence that appellant "knew that his own actions would involve a grave risk of death," "intended to kill" or "knowingly conspired with accomplices known to have killed before." (*Ibid*.) Although the appellant and two of the robbers were members of a gang some of whose members had engaged in shootings and murders, there was "[n]o evidence indicat[ing] [the appellant] or his two confederates had ever participated in shootings, murder, or attempted murder . . . ." (*Id*. at pp. 810–811.) The court rejected the Court of Appeal's reasoning, relied on by the People, that knowing

---

**20** The court in *Banks* stated that "the standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2[, subdivision] (d) for life imprisonment without parole . . . ." (*Banks*, *supra*, 61 Cal.App.4th at p. 804.) That is not because the federal constitution imposes the standards on a special circumstance that will result in a life imprisonment sentence but because as a matter of statute, section 190.2, subdivision (d) incorporated the Eighth Amendment death penalty standard.

participation in an armed robbery is sufficient. (*Id*. at p. 808; see also *id*. at p. 809, fn. 8.) Instead, the court also set forth a number of "factors that . . . may play a role in determining whether a defendant's culpability is sufficient to make him or her death eligible." (*Id.* at p. 803.) "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*Id*. at p. 803, fn. omitted.)

In *Clark,* the court again addressed the reckless indifference prong and found the evidence insufficient to meet it. (*Clark*, *supra*, 63 Cal.4th at p. 623.) Clark was also convicted of a robbery special-circumstance murder, although another man shot the victim to death. The court again pointed out that "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Id*. at p. 618.) However, the court made several pertinent observations about the kind of evidence a court should consider in determining whether this standard has been met.

It noted that "[a] defendant's *use* of a firearm . . . can be significant to the analysis of reckless indifference to human life" because such an action could " 'indicate a reasonable expectation that the death of the deceased or another would result.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) In *Clark*, there had only been one gun that was loaded with one bullet at the scene of the shooting, and that gun was carried by a person other than Clark. (*Id*. at p. 619.) Other factors having a bearing on reckless indifference included "[p]roximity to the murder and the events leading up to it," which "may be particularly

43

significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Ibid.*) The court noted that a party present at the scene has an opportunity to restrain the use of violence and is arguably more at fault for a murder if he or she does not. (*Ibid*.) Clark had been across a parking lot waiting for the shooter at the time of the killing and without opportunity to prevent it, and there was no evidence he instructed the shooter to use lethal force. (*Id*. at pp. 619–620.) The court also noted that "[a] defendant's knowledge of factors bearing on a cohort's likelihood of killing are significant to the analysis of reckless indifference to human life." (*Id.* at p. 621.) However, there was no evidence that the shooter was known to have a propensity for violence, that Clark knew of such a propensity, or that Clark had the opportunity to observe anything in the shooter's actions prior to the shooting that indicated the shooter was likely to engage in lethal violence. (*Ibid*.) Also, Clark had planned the robbery in ways to minimize the use of violence. (*Id*. at pp. 621–622.)

In her supplemental brief, Price argues the instructions given to her jury were erroneous because they did not provide sufficient guidance, specifically, guidance provided in *Banks* and *Clark* regarding the elements of the special circumstance. She argues CALCRIM No. 703 has now been amended to incorporate *Banks*'s holding by listing the factors identified in *Banks* that are relevant to the determination whether a non-killer defendant was a "major participant," and CALJIC No. 8.80.1 has been amended in the same way and also to elucidate the factors pertaining to the "reckless indifference" element of the special circumstance as applied to non-killers. "Had appellant been tried in September 2016 rather than September 2013," Price contends, "her jury would have received the additional guidance the Supreme Court prescribed in *Banks* and *Clark*."[21]

---

[21] Price also argues in her supplemental brief for the first time that the instructions given on the special circumstance were "incorrect, incomplete and confusing" because CALCRIM No. 730 did not mention the major participant and reckless indifference elements, which were only mentioned in CALCRIM No. 703. This argument was not made in Price's opening or reply briefs and does not relate to any holding in *Banks* or

44

She also argues that the jury should have been instructed "that a 'major participant' acting with 'reckless disregard' must aid and abet the underlying felony in a way that creates or increases the risk of death, and do so knowingly."

The People, on the other hand, point out that *Banks*'s discussion of the meaning of the "major participant" and "reckless indifference" elements of the special circumstance for non-killers was in the context of a challenge to the sufficiency of the evidence, not a challenge to the adequacy of the instructions. The People further direct our attention to language in *Banks* they contend shows the court did not intend to prescribe any new or different jury instructions on the subject. Specifically, they quote the Supreme Court's agreement with *People v. Proby* (1998) 60 Cal.App.4th 922 that " 'major participation' should be understood as the phrase is used in common parlance, as including those whose involvement is ' "notable or conspicuous in effect or scope" ' and who are ' "one of the larger or more important members . . . of a . . . group" ' " and that "there is no reason to think either the United States Supreme Court in *Tison* or the drafters of Proposition 115 had in mind a specialized or technical meaning for 'major participant.' " (*Banks*, *supra*, 61 Cal.4th at pp. 800–801.) *Banks*, the People argue, "breathed no hint that the standard instructions were insufficient to inform the jury of the appropriate factors" to consider in determining whether the requirements of the special circumstance were met. The People make a similar argument in regard to *Clark*, contending its discussion of the reckless indifference element in the context of a challenge to the sufficiency of the evidence cannot "be taken as supporting a requirement for jury instruction in the *Banks* factors."

Further, the People point out that the Supreme Court concluded in *Estrada*, *supra*, 11 Cal.4th at p. 578, that "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her participation in the underlying felony. This is the meaning intended by the phrase 'reckless indifference to human life' as it is used in section 190.2[, subdivision]

*Clark*. The argument is beyond the scope of the issues on which we sought supplemental briefing, and by failing to raise it in her opening brief Price has forfeited it.

(d), and as defined in *Tison*. The phrase therefore does not have a technical meaning peculiar to the law, and the trial court had no sua sponte duty to further define the statutory phrase for the jury." We note that the court in *Banks* cited *Estrada* approvingly in its discussion of the meaning of the reckless indifference element without questioning its holding that the reckless indifference language of section 190.2, subdivision (d) is adequate to apprise the jury of what is required and is not unconstitutionally vague. (See *Banks*, *supra*, 61 Cal.4th at pp. 798, 801, 804.)

The decisions in *Banks* and *Clark* indicate the felony-murder special circumstance may not lightly be applied to every participant in a felony murder and that the evidence required to meet the major participant and reckless indifference elements in the case of a non-killer must reflect a high degree of culpability. However, we agree with the People that neither case compels a more explicit jury instruction on particular factors or facts that must be proven to establish such culpability. The Supreme Court's express approval of *Proby* and citation of *Estrada* with approval support the People's arguments that there is no constitutional requirement of a more explicit or detailed instruction on the meaning of the special circumstance elements. And, until and unless the Supreme Court overrules *Estrada*, we are bound by it. Finally, contrary to Price's argument, the fact that the drafters of the jury instructions chose to amend them in light of *Banks* and *Clark* does not mean the amendments are constitutionally required. At most, the amendments suggest the drafters thought providing more guidance based on *Banks* and/or *Clark* could reduce the number of instances in which juries made a special circumstance finding that would later be determined insufficiently supported by the evidence. (See CALCRIM No. 703, Bench Notes [court does not have sua sponte duty to define reckless indifference to human life; however this should not discourage trial courts from amplifying the statutory language for the jury; court may give the definition if requested; trial court should consider whether *Banks* factors need be given].)

For all of the above reasons, we reject Price's claim that the statute providing the felony-murder special circumstance and the instruction given on that subject were too vague and therefore violate due process.

46

# IV.

### *People v. Banks and People v. Clark Do Not Support Price's Argument That There Was Insufficient Evidence to Support the Special Circumstance Finding.*

We now turn to whether, in light of *Banks* and *Clark*, we must conclude that the jury's finding that the special circumstance was true is not supported by substantial evidence, an issue on which, as we already noted, we sought supplemental briefing. "The standard of review for a sufficiency of the evidence claim as to a special circumstance is whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' [Citations.] The standard is the same under the state and federal due process clauses. [Citation.] We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial." (*Clark*, *supra*, 63 Cal.4th at p. 610.)

Price's argument that the evidence here was insufficient focuses solely on section 190.2, subdivision (d), the reckless indifference and major participant requirements that provision imposes for felony murder participants who are not the actual killer and the *Banks* factors that are considered on review of a special circumstance finding for a non-killer. She observes that "[t]he jury expressly rejected Fells's testimony appellant shot Merrill" and that "[t]he court defers to the jury's credibility determination."

The People, on the other hand, argue that section 190.2, subdivision (d), its elements and the *Banks* factors need not be applied here because "there was substantial evidence that appellant was the *actual killer, and that she had the intent to kill*." They contend the jury's rejection of the allegations of personal use of a gun by Price "is legally insignificant." They rely on section 954 and case law applying it, including *People v. Miranda* (2011) 192 Cal.App.4th 398, from which they quote the following language: "In part, section 954 provides: 'An acquittal of one or more counts shall not be deemed an acquittal of any other count.' It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by

47

substantial evidence. [Citation.] '[A]ny verdict of guilty that is sufficiently certain is a valid verdict even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilty of a different offense.' [Citation.] The rule applies equally to inconsistent enhancement findings [citation], and to an enhancement finding that is inconsistent with the verdict on a substantive offense [citation]. In [*People v.*] *Lewis*, [(2001) 25 Cal.4th 610], the court explained, ' "Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient." [Citation.]' (*Lewis*, *supra*, at p. 656.) 'An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict.' " (*Id.* at pp. 405–406.)

The People correctly state the law. In evaluating whether there was sufficient evidence to support the special circumstance finding, we disregard the jury's findings on the personal use allegations and consider all of the evidence presented to the jury regarding Price's role in the murder, including the evidence indicating Price was the actual shooter. As we have already discussed, the evidence of felony murder against Price was strong. Based on the evidence and reasonable inferences, the jury could readily have concluded that she was the person who played the most prominent role both in planning to rob Merrill, robbing him and killing him, and that she intended to shoot him and did so.

The evidence showed Price accompanied Brown to San Francisco, where they picked up Merrill and took him back to Pittsburg. When they arrived back in Pittsburg, Price went into Edosa's house with Merrill's iPhone in her possession. She entered Fells's room and took Fells's gun from the drawer. Price was familiar with and had used guns in the past, but needed Fells's gun because her own had been confiscated. She carried Fells's gun on her person during the ride to the park. When they arrived at the park, she exited the car with the others and participated in robbing Merrill, insisting there was more and continuing to search him after Brown said she had taken something from

48

him. According to Fells, Price pointed the gun at him and shot him. They left him at the park to die, hurriedly fleeing the scene. While both Brown and Price were involved with Merrill's iPhone after the murder, Price used it repeatedly to call and text Fells and ended up with it when they were apprehended by police. Fells's testimony along with Bardell's indicated Price was the user of Merrill's iPhone, and Price told Wilks she got the phone "in a little lick." Fells accused Price of doing too much and Price said she knew what she was doing and it needed to be done. Price wrote a note to Brown in jail suggesting an alibi they should use for their trip to San Francisco and their possession of Merrill's iPhone.

These facts, which the evidence supported, were more than sufficient to support a jury finding that Price was the one who killed Merrill and that she did so intentionally because, in her own words, "it need 2 b did." That this jury may not have concluded beyond a reasonable doubt that Price was the actual killer does not mean no rational jury could have found she was beyond a reasonable doubt.

Finally, even if, in view of the jury's findings on the enhancement, we disregarded Fells's testimony that Price was the shooter, it would make no difference. The jury did not necessarily reject all of Fells's testimony, and we must therefore consider it. And Fells's testimony coupled with considerable other evidence demonstrates Price was a major participant in the felony murder and actually intended that Merrill would be killed. She participated in the crime from beginning to end, including driving to San Francisco, picking him up, taking (and keeping) his iPhone, returning to Pittsburg with him inebriated and passed out in the back seat of the car, stopping at Fells's house to get Fells's gun, taking the gun and Merrill to the park, participating in a further attempt to rob him there and, after he was shot, leaving him in the park alone to die. Price's intent that he be killed is further supported by her own words to Fells and their implications in the days after the crime: she knew what she was doing, shooting Merrill was necessary

49

and if she had not been thinking (and, inferentially, if he had not been killed) they would all be in jail.[22]

In short, the evidence is more than sufficient to support the jury's true finding as to Price on the felony-murder special circumstance.

## V.
### *The Court's Instruction on Flight Was Not in Error.*

Price next argues the court's instruction on flight, based on CALCRIM No. 372, was inconsistent with the statute regarding flight and was impermissibly argumentative, violating her right to due process. The People respond that Price's contentions "have been rejected by numerous cases," citing *People v. Paysinger* (2009) 174 Cal.App.4th 26 (*Paysinger*) and *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154 (*Hernández Ríos*), and, further, that any error was harmless. We agree with the People in both respects.

The flight statute, section 1127c, provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given."

The trial court, based on CALCRIM No. 372, instructed the jury, "If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that she was aware of her guilt. If you conclude that the defendant fled or tried

---

[22] We note that intent to kill for an aider and abettor in a felony murder would be enough to support the special circumstance finding, and where there is intent no finding that the defendant was a major participant is required. But here, the evidence supported both.

50

to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

The cases the People cite are directly on point because they address the specific instruction Price now challenges. In *Paysinger*, the defendant challenged his second degree robbery conviction by arguing that CALCRIM No. 372 " 'undermines the presumption of innocence, relieves the prosecution of the burden to prove the offense beyond a reasonable doubt and deprives the defendant of a jury verdict . . . because the instruction presumes "the crime was committed." ' " (*Paysinger*, *supra*, 174 Cal.App.4th at p. 30.) In arguments strikingly similar to those made by Price, Paysinger "argue[d] at some length about how the language of CALCRIM No. 372 differs from the language in Penal Code section 1127c, which provides for the giving of a flight instruction when appropriate." (*Id*. at p. 31, fn. omitted.) The court disagreed. Justice Robie's analysis is persuasive, and we adopt it:

"Defendant first points out that CALCRIM No. 372 tells the jury that flight may show awareness of guilt before telling the jury that flight alone is not sufficient to prove guilt, while Penal Code section 1127c communicates those ideas in the opposite order. To the extent defendant suggests this difference makes the CALCRIM instruction constitutionally deficient because the first sentence of the instruction 'strongly suggests . . . that evidence of flight is in fact sufficient to show guilt,' we are not persuaded. The first sentence of CALCRIM No. 372 suggests no such thing, and in any event the final sentence of the instruction positively refutes any such suggestion. In reviewing an instruction for constitutionality, we do not view it in isolation from the other instructions the court gave and we certainly do not view one part of an instruction in isolation from another part. Viewed as a whole and in light of the other instructions, CALCRIM No. 372 is not unconstitutional.

"Next, defendant complains that while Penal Code section 1127c 'in no way tells the jury how it should interpret flight, if proved, nor what conclusion it may draw from the fact of flight,' CALCRIM No. 372 'tells the jury flight may prove guilt.' Defendant, however, makes no effort to explain why this difference is significant. It has long been

accepted that if flight is significant at all, it is significant because it may reflect consciousness of guilt, which in turn tends to support a finding of guilt. (See, e.g., *People v. Hutchinson* (1969) 71 Cal.2d 342, 346.) That CALCRIM No. 372 tells the jury this does not in any way make the instruction unconstitutional." (*Paysinger*, *supra*, 174 Cal.App.4th at pp. 31–32.)

Also on point is *Hernández Ríos*, in which the defendant argued that CALCRIM No. 372 is not neutral. As Price describes it, the instruction fails to "guard against a fallacious inference," namely, that those who flee are guilty. (See *Hernández Ríos*, *supra*, 151 Cal.App.4th at p. 1158.) As *Hernández Ríos* explained, the California Supreme Court has in essence rejected that argument, albeit in the context of the parallel CALJIC instruction:

"On whether a flight instruction permitting a jury to infer 'awareness of guilt' is constitutional, the California Supreme Court's rejection of an analogous challenge to CALJIC No. 2.52 is instructive. In *People v. Mendoza* (2000) 24 Cal.4th 130, (*Mendoza*), the defense argued that 'the instruction creates an unconstitutional permissive inference because it cannot be said with " 'substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend.' " ' [Citation.] Noting that a permissive inference violates due process 'only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury,' *Mendoza* held that permitting 'a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a *consciousness of guilt*' is not violative of due process." (*Hernández Ríos*, *supra*, 151 Cal.App.4th at p. 1158.)

The defendant in *Hernández Ríos*, again like Price here, also argued that CALCRIM No. 372 "impermissibly lowers the prosecution's burden of proof." (*Hernández Ríos*, *supra*, 151 Cal.App.4th at p. 1159.) Again the court rejected the argument, based on a California Supreme Court case:

"In *People v. Navarette* (2003) 30 Cal.4th 458 (*Navarette* ), the defense argued that there might be 'reasons for flight other than consciousness of guilt,' that there might

be flight 'on account of a minor crime [the defendant] *did* commit, though he had no connection with a more serious crime he *did not* commit,' and that there might be lack of 'consciousness of guilt' even if the defendant was guilty, so 'the court should have instructed the jury not to consider evidence of flight unless it first concluded defendant was in fact fleeing.' [Citation.] 'The purpose of presenting evidence of flight is to establish consciousness of guilt,' the court wrote, 'but defendant argues the jury should first have found that defendant had a guilty conscience before considering the evidence of flight.' [Citation.] *Navarette* summarily rejected that argument: 'Defendant's theory turns the instruction on its head.' " (*Hernández Ríos*, *supra*, 151 Cal.App.4th at p. 1159.)

*Paysinger* and *Hernández Ríos* are persuasive authority on the validity of CALCRIM No. 372, which we conclude is neither argumentative nor unconstitutional. On its face it does not lighten the prosecution's burden of proof to show guilt beyond a reasonable doubt. Moreover, even if there was instructional error here, the jury could not possibly have understood the instruction that way in the context of the many other instructions explaining the prosecution's burden of proof to demonstrate defendant's guilt beyond a reasonable doubt and referring to that burden with respect to each of the crimes and special circumstances charged.

Price takes issue with the instruction for stating that conduct of fleeing or attempting to flee immediately after the crime "may show" awareness of guilt, and suggests that a proper instruction would have been to tell the jury it could consider evidence of flight in determining her "guilt or innocence." She also contends that stating flight alone will not support an inference of guilt *after* stating flight may show awareness of guilt gave "primary significance to the debunked prosecution-favorable inference [that flight may indicate guilt], and only secondary inference [*sic*] to its limitation." Price relies heavily on *People v. Wright* (1988) 45 Cal.3d 1126 (*Wright*) and our opinion in *People v. Hunter* (2011) 202 Cal.App.4th 261 (*Hunter*).

Neither case is persuasive here. In *Hunter*, the defendant, who had been convicted of second degree robbery and second degree commercial burglary, challenged a pinpoint instruction given at the request of the prosecutor "telling the jury that the inability of

53

appellant's victims to say conclusively that the 'gun' he used in the commission of the crimes was real 'does not create a reasonable doubt as a matter of law that the gun was not a firearm.' " (*Hunter*, *supra*, 202 Cal.App.4th at p. 264.) Specifically, the instruction stated: " 'When a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm. The victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt as a matter of law that the gun was a firearm.' " (*Id.* at p. 267.)

We held the instruction was problematic in two respects. First, it was "unduly argumentative" because the initial sentence—that the object's appearance and the defendant's conduct and words in using it could support a finding that it was a firearm— was no more accurate than the opposite statement. It would have been just as accurate to say the object's appearance and the defendant's conduct and words could support a finding that it was *not* a firearm. (*Id.* at p. 276.) The second problem was constitutional: specifically, the instruction lightened the prosecution's burden of proof in violation of the Fifth and Sixth Amendments. (*Ibid.*) It highlighted one piece of evidence—the victims' inability to say with certainty that the gun was real—and cautioned against finding a reasonable doubt based on that evidence. (*Ibid.*) By doing so, it "impermissibly alleviated the district attorney's need to persuade the trier of fact that the gun used in the robbery was a real one, the most important fact at issue in the case." (*Ibid.*) We held that "the giving of an instruction suggesting that evidence received by the court and properly before the jury is insufficient to create reasonable doubt about an issue the district attorney was required to prove is manifestly impermissible." (*Id.* at p. 277.)

CALCRIM No. 372, in the form given by the trial court here, is not analogous to the instruction challenged in *Hunter* in either respect. First, it cannot be said that a defendant's flight or attempt to flee immediately after the crime is as likely to show innocence as it is to show guilt. Flight may show consciousness of guilt or it may not, but unlike the victim's inability to say that the gun was real in *Hunter*, evidence of flight has *no* tendency to establish innocence. Indeed, while section 1127c requires that the

54

jury be instructed that flight is not sufficient to establish guilt, it gives the jury permission to consider flight as some evidence of guilt. As our high court observed nearly fifty years ago, "[i]t is settled law that the reason flight is relevant is because it may demonstrate consciousness of guilt. [Citations.] Evidence of flight has no other probative value. Certainly, then, it is not improper to inform the jury of the reason why it is asked to consider defendant's flight as a factor that might tend to indicate his guilt of the crime charged." (*People v. Hill* (1967) 67 Cal.2d 105, 120 (*Hill*).)[23]

Nor does CALCRIM No. 372 lessen the prosecution's burden. Unlike the instruction in *Hunter*, CALCRIM No. 372 does not focus on certain evidence and direct the jury how to consider the evidence. Rather, while informing the jury that it can infer guilt from flight, it both leaves it "up to you [the jury] to decide the meaning and importance of that conduct" and further, limits the use of flight evidence by providing that it is not alone sufficient to prove guilt.

*Wright* is even less relevant than *Hunter*. At issue in that case was whether an instruction requested by the defendant was properly rejected as argumentative. (*Wright*, *supra*, 45 Cal.3d at pp. 1135–1138.) Price cites *Wright* for the proposition that any instruction that "invite[s] the jury to draw inferences favorable to [one party] from specified items of evidence on a disputed issue of fact" is argumentative. (*Id.* at p. 1135.) But unlike the instruction the defendant requested in *Wright*, which sought to focus the jury's attention on a list of items of evidence that favored the defendant, the instruction here focuses solely on one factor, evidence of flight, and not on a laundry list of evidence favoring the prosecution, and there is a statute—section 1127c—that requires an instruction on flight if there is evidence of flight. (§ 1127c.)

Accordingly, we reject Price's claim.

---

[23] The court in *Hill* also explained that "[t]he Legislature's purpose in enacting section 1127c was to abolish the rule stated in many early cases that the jury could not be instructed to consider flight as evidence of guilt unless it had been proved that the fleeing suspect had previously learned that he was accused of commission of a particular crime." (*Hill*, *supra*, 67 Cal.2d at pp. 120–121.) It was thus designed to allow, not prevent, consideration of flight as evidence of guilt.

# VI.

## *The Prosecutor Did Not Improperly Vouch for Fells.*

Price's final substantive argument about the trial is that the prosecutor committed misconduct by improperly vouching for Fells, "putting [his] personal belief in Fells's truthfulness before the jury." She bases her claim on the following exchange between the prosecutor and Fells during her direct testimony:

"Q: Now specifically about making sure you get the right deal, you understand if you lie to this jury, then your deal is out the window even though you have been to prison for almost three years, you would be brought back here and you would face murder charges, right?

"A: Yes.

"Q: That means—when I made the agreement with you, I explained to you exactly what lying meant?

"A: Yes.

"Q: And what I mean by that is if you lie to help me, then that's lying and your deal is out the window?

"A: Yes.

"Q: If you lie to protect Felicia Edosa, your deal is out the window?

"A: Yes.

"Q: If I catch you lying, even if it's good for me in my case, but you are lying, you lose your deal, you understand that?

"A: Yes."

We reject Price's vouching claim for two reasons. First, she has forfeited it by not first objecting to this exchange below. (*People v. Williams* (2103) 56 Cal.4th 165, 193 (*Williams*); *People v. Bonilla* (2007) 41 Cal.4th 313, 336 (*Bonilla*).) Price contends that she is excused from this failure to object because no admonition would have cure the improper vouching. However, this is based on the premise that the evidence in this case was too close for such an admonition to be effective. Even if there had been improper vouching, this was not the case. While it is true that Fells was an important witness, there

is a considerable body of evidence other than her testimony implicating Price in Merrill's murder. This includes not only the fact that Price was found with his iPhone, but Brown and Darnell's recorded conversation in the police car about Brown falsely claiming the iPhone was hers; Edosa's testimony, including Price's reference to the numerous calls to Edosa's phone from the iPhone before the murder; the text messages from Price to Fells that directly implicated Price in the robbery and murder; Price's statement to Wilks that she got the iPhone "in a little lick"; the Dardens' testimony and FasTrak records that showed Darden's car crossing into San Francisco before the murder and that Price was in the car with Brown when they returned it to Nicky Darden shortly after the murder; and the "kite" Price wrote to Brown in jail implicating them both and presenting Brown with an alibi for travelling to San Francisco on the night of the murder and for Price having Merrill's iPhone in her possession. Further, the verdict makes plain that the jury did not rely on the prosecutor's opinion of Fells's truthfulness because the jury rejected Fells's testimony that Price was the shooter. All of this belies Price's argument that any alleged "vouching" by the prosecutor was incurable. Therefore, Price has forfeited her "vouching" claim.

Second, and regardless, we reject Price's misconduct claim on the merits. We begin with the law. "Improper remarks by a prosecutor can ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair." (*People v. Frye* (1998) 18 Cal.4th 894, 969 (*Frye*), overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 422, fn. 22.) "A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. [Citation.] However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the]

57

record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." (*Frye*, at p. 971.) On appeal, "[t]o prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*Id.* at p. 970.)

Price acknowledges that making a record of the terms of a plea agreement requiring a witness to tell the truth is not impermissible vouching. However, she claims the prosecutor's questioning of Fells "crosse[d] the line into impermissible vouching" because he questioned her not only about what would happen if she lied for the defense but also what would happen if she lied for the prosecution. Further, she argues, the prosecutor "asked [Fells] to testify about what *he told her* would happen if *he believed* she was lying." This, Price argues, left the jury with the impression that Fells's testimony must be truthful because "her deal was still in place, demonstrating the prosecutor believed she was telling the truth."

We disagree based on our review of the case law. In *Frye*, consistent with the obligation to disclose to the jury any inducements to testify made to a prosecution witness, the prosecutor read the immunity agreement of a witness who testified against the defendant. (*Frye*, *supra*, 18 Cal.4th at pp. 970–971.) The agreement indicated the witness had cooperated in the investigation of the murders and memorialized her assertion that she would " 'continue to be truthful in her statements.' " (*Id.* at p. 970.) It also provided that " '[a]lthough the District Attorney believes [the witness] was an unwilling participant and thus not an aider and abettor or accessory under the law, reasonable minds may differ when viewing the same factual situation,' " and stated no charges would be filed against the witness in consideration of her promise to continue to cooperate in the investigation and to testify truthfully. (*Ibid.*) The defendant argued that by reading the agreement to the jury, the prosecutor vouched for the witness's veracity

58

and "indicated to the jury that the district attorney's office had confirmed [her] credibility before calling her to the stand." (*Id*. at pp. 970–971.) The defendant also complained about the prosecutor's comments in closing argument (made after reminding the jury that it should view the witness's testimony with caution if it believed she was an accomplice) that the jury, even if it did not like the witness, had "to realize by now that [she] is telling the truth about the thing that she witnessed on that night." (*Id*. at pp. 971–972.)

The *Frye* court rejected the defendant's contentions. It first observed: "neither the phrasing nor the content of [the witness's] agreement to testify truthfully suggested a pretrial determination by the district attorney that [the witness] would be telling the truth, or otherwise portrayed the district attorney's office as privy to information bearing on [the witness's] veracity that was not admitted at trial. The agreement recites only that [the witness] promised to tell the truth in exchange for the district attorney's promise to refrain from charging her with any crimes relating to the . . . murders." (*Frye*, *supra*, 18 Cal.4th at p. 971.) The court also found the prosecutor's closing argument statement did not "implore jurors to forgo their independent assessment of the evidence and accept the prosecutor's word that [the witness] was being truthful." (*Id*. at p. 972.) Rather, "[t]he comment 'you must realize by now [[the witness] is telling the truth]' was simply a call to reflect on all of the evidence presented at trial. It is not reasonably likely the jurors would have understood it to reflect any personal knowledge or information by the prosecutor." (*Ibid*.)

In later cases in which, much like here, the prosecutor informed the jury of an immunity or plea agreement either by reading from it or by questioning the accomplice-witness about it, our high court has twice rejected claims of vouching. In *Williams*, the witness was asked about her agreement and testified she was required to tell the truth, was charged with murder, burglary and other crimes, could receive the death penalty for those crimes, avoided that penalty, was serving a 20-year sentence in exchange for testifying and would have her "deal taken away" if she lied about her own or others' involvement in the crime. (*William*, *supra*, 56 Cal.4th at pp. 189–191.) The court rejected the vouching claim, concluding that "[t]he prosecutor did not place the prestige

59

of the government behind [the witness] through personal assurances of veracity, or suggest that information not presented to the jury supported his testimony." (*Id*. at p. 193.) Citing *Frye* and *Bonilla*, the court opined: "It is settled that making a record of the terms of a plea agreement requiring a witness to tell the truth does not constitute impermissible vouching. [Citations.] Here, as in *Bonilla*, 'The jury *might* believe the prosecutor thought [the witness] was being truthful, but there is no reason to think it would have concluded the prosecutor had special information *outside the record* on which to base that belief, nor is there any reason to think this inference would have led the jury to conclude it no longer needed to evaluate [the witness's] credibility for itself.' " (*Williams*, at p. 193.)

In *Bonilla*, the prosecutor during opening and closing argument at both the guilt and penalty phases of the defendant's trial referred to the terms of its star witness's plea agreement, which required the witness to testify truthfully. (*Bonilla*, *supra*, 41 Cal.4th at p. 334.) The prosecutor also discussed the witness's testimony, addressing his initial shifting stories and that the agreement required him to testify truthfully or lose his plea deal, and described him as getting to the " 'preliminary hearing where now it is crunch time and *he resolves in his own mind that he has got to tell the truth, the full truth, he goes that extra step and talks about things that were said*.' " (*Id.* at p. 335.) The prosecutor also described the witness's " '*story hold[ing] up under cross-examination because he was telling the truth about what happened*.' " (*Ibid*.) Finally, the prosecutor argued that the defense counsel's purported desire that the jury "believe . . . that [the witness] was spoon-fed all this information so that we could elevate this case beyond what it was" was " 'ludicrous' " in view of other evidence corroborating much of his testimony and in view of the fact that if he violated his plea agreement it would be void. (*Id*. at pp. 335–336.)

The *Bonilla* court held the defendant's vouching argument had been partially waived. (*Bonilla*, *supra*, 41 Cal.4th at p. 334.) It also rejected it on the merits because the rule prohibiting the prosecutor from invoking personal prestige or office reputation to bolster the case "do[es] not preclude all comment regarding a witness's credibility. . . .

60

'[S]o long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," her comments cannot be characterized as improper vouching.' " (*Id*. at pp. 336–337.) The court observed that the prosecutor's arguments were of three kinds: "arguments that [the witness] should be believed because he had an incentive to tell the truth under the terms of his plea agreement; arguments he should be believed because, despite extensive cross-examination, his preliminary hearing and trial testimony were consistent; and arguments he should be believed because other evidence in the record corroborated his testimony." (*Id*. at p. 337.) All were permissible because they were "arguments from the evidence, suggesting reasonable inferences the jury could draw that might lead it to credit [the witness's] testimony." (*Ibid*.) None "suggest[ed] the prosecutor had personal knowledge of facts outside the record showing [the witness] was telling the truth" or "invited the jury to abdicate its responsibility to independently evaluate for itself whether [the witness] should be believed." (*Id*. at pp. 337–338.)

Price attempts to distinguish these cases on the ground that her prosecutor asked Fells not only about lying to favor the defendant but also about lying to favor the prosecution. She fails to explain why that matters, much less how it distinguishes this case from *Frye*, *Williams* or *Bonilla*. As in those cases, her prosecutor was required to inform the jury of the plea agreement offered to induce Fells's testimony. Just as Price's prosecutor sought to establish that Fells had not been asked to testify falsely either against or in favor of the prosecution's case, the prosecutor in *Williams* asked whether the witness would lose his " 'deal' " if he " 'minimize[d] [his] involvement in these crimes,' " " 'maximize[d] anybody else's involvement in these crimes,' " or " 'falsely cast blame on anybody else.' " (*Williams*, *supra*, 56 Cal.4th. at pp. 190–191.) Likewise, in *Bonilla*, the prosecutor discussed the plea agreement, signed by the prosecutor, contended that the defense counsel wanted the jury to believe the witness " 'was spoon-fed all this information so that we could elevate this case beyond what it was,' " called that suggestion " 'ludicrous,' " then discussed corroborating evidence, and returned to the

61

plea agreement, reminding the jury, " 'He violates it, it is void. There is no question about that.' " (*Bonilla*, *supra*, 41 Cal.4th at pp. 335–336, italics omitted.)

Also, as *Frye*, *Williams* and *Bonilla* all demonstrate—and contrary to Price's argument—it is *not* misconduct for the prosecutor to address the obvious credibility issue that will necessarily arise when an accomplice or similarly involved witness testifies in exchange for a plea agreement by eliciting the term of the agreement requiring the witness to testify to the truth rather than in favor of one side or the other. That is not "vouching" in the sense of placing the prestige of the government behind the witness; rather, it is fairly informing the jury of the nature and limitations of the inducement offered. That a jury may infer the prosecutor believes the witness is testifying truthfully does not mean there has been misconduct. There is misconduct only if the prosecutor's questions or arguments suggest his or her belief in the witness's veracity is based on information to which the jury is not privy or otherwise encourage the jury to rely on the prosecutor's belief rather than assessing the witness's credibility for itself. (*Frye*, *supra*, 18 Cal.4th at p. 971; *Williams*, *supra*, 56 Cal.4th at p. 193; *Bonilla*, *supra*, 41 Cal.4th at pp. 337–338 & fn. 9.)

Price heavily relies on *People v. Alvarado* (2006) 141 Cal.App.4th 1577 (*Alvarado*). It does not aid her argument. Like *Frye*, *Williams* and *Bonilla*, it recognizes that where a prosecutor gives assurances regarding the apparent honesty or reliability of prosecution witnesses, there is no misconduct if such assurances are based on the record and the inferences reasonably drawn from it, and not on purported extra-record knowledge or belief. (*Alvarado*, at p. 1584.) Also, *Alvarado*'s facts bear no resemblance to those here. The *Alvarado* court found misconduct consisting of the prosecutor's statements to the jury that she had taken an oath as a deputy district attorney not to prosecute a case if she had any doubt that the crime occurred and that the defendant charged was the person who committed the crime. (*Id*. at p. 1585.) Price's prosecutor made no such invocation of his oath or his office, much less use of such comments to

bolster his case. He simply elicited from Fells that her agreement hinged on her telling the truth and not lying for either the defense or the prosecution.[24]

For the same reasons as those stated by our Supreme Court in *Frye*, *Williams* and *Bonilla*, we conclude there was no vouching here. While Price's jury may have inferred that the prosecutor believed Fells was testifying truthfully, nothing in his questioning of Fells or her answers suggested he had any " 'special information *outside the record* on which to base that belief.' " (*Williams*, *supra*, 56 Cal.4th at p. 193.) Nor did he say or do anything to lead the jury " 'to conclude it no longer needed to evaluate [Fells's] credibility for itself.' " (*Ibid*.) And again, the verdict here indicates that the jury did not rely on any implied opinion of the prosecutor but evaluated Fells's credibility independently and found it wanting, at least in regard to her testimony that Price was the shooter. In other words, it did exactly what it was supposed to do: decide for itself whether and to what extent it believed Fells's testimony.

## VII.

### *Price's Remaining Arguments*

Price claims ineffective assistance of counsel based on her counsel's failure to object to the CALCRIM No. 372 instruction on flight and the prosecutor's purported misconduct. We need not address these claims, which depend on a determination that there was error in the instruction and misconduct by the prosecutor, because we have concluded there was neither. Nor, having found no errors, do we need to address Price's cumulative error claim.

---

[24] Nor are the Ninth Circuit cases Price cites apposite. In *United States v. Witherspoon* (9th Cir. 2005) 410 F.3d 1142, for example, the prosecutor repeatedly, even after a sustained objection, told the jury the officers were credible and truthful and had no reason to lie in the case and, further, that if they lied they risked losing their jobs, pension and livelihood and could be prosecuted for perjury. (*Id*. at p. 1146.) The court found the prosecutor had "clearly urged that the existence of legal and professional repercussions served to ensure the credibility of the officers' testimony" and that this was "vouching based on matters outside the record." (*Ibid*.) Here, the plea agreement was not outside the record.

## VIII.

### *The Parole Revocation Fine Must Be Stricken.*

The parties agree that the court erroneously imposed a parole revocation fine of $560 because it applied only where the sentence includes a period of parole. We agree. (§ 1202.45, subd. (a).) Since Price received a sentence of life without parole, this fine must be stricken.

## DISPOSITION

The judgment is modified to strike the imposition of a $560 parole revocation fine pursuant to section 1202.45. In all other respects, the judgment is affirmed.

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
RICHMAN, J.

Trial Court:   Contra Costa County Superior Court

Trial Judge:   Hon. Charles B. Burch

Counsel:

Alan Siraco, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, David H. Rose, Deputy Attorney General, for Plaintiff and Respondent.]