Filed 12/3/21  P. v. Settles CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B303705 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA461802) |
| v. | |
| ZEKIAH SETTLES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

Sixteen-year-old Zekiah Settles (appellant) was convicted of the first degree murder of 16-year-old Kevin Cleveland (Pen. Code, § 187, subd. (a))[1] and the willful, deliberate and premeditated attempted murders of 17-year old Kierra Harris and high school student Daymond Lafayette (§§ 187, subd. (a), 664).[2] The jury found true firearm allegations (§ 12022.53, subds. (b), (c), and (d)) and allegations that the offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)); the evidence indicated that the shootings were in retaliation for the murder of appellant's uncle. Appellant was convicted primarily by the testimony of co-defendant Raven Hall; her testimony was sufficiently corroborated by one eyewitness to the shooting and by appellant's own statements on Facebook and other social media. The trial court sentenced appellant to 130 years to life in prison, plus 14 years 8 months.

Appellant contends 1) the trial court erred in admitting a December 2019 Facebook post in which he admitted he had a gun; 2) the prosecutor impermissibly vouched for Hall when she questioned Hall about the truthfulness requirement of her plea agreement and referred to that requirement in her closing argument; and 3) there is insufficient evidence to corroborate Hall's accomplice testimony. We affirm the judgment of conviction.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] Before trial, appellant pled no contest to count 5 (robbery), which was not related to the murder and attempted murders, and to count 6 (possession of a firearm by a minor).

## BACKGROUND

On December 10, 2016, appellant's uncle, 16-year-old Tyrone Davis, was killed in a suspected gang-related shooting. Davis, known as "50 Bang," was a member of the 5557 Neighborhood Crips (5557 Crips). The 5557 Crips were part of the Rolling 50s gang. Appellant was a member of the Rolling 50s gang and the 5557 subset; he was known as "BK7." The 62 Brims, rivals of the Rolling 50s, were believed to be responsible for shooting Davis. In a discussion of Davis's murder on Facebook two weeks after the killing, a friend told appellant he should get a gun. Appellant replied on Facebook that he had one.

On April 4, 2017, Cody McCoy, a 5557 Crips gang member known as D5, was shot in the ankle in a drive-by shooting on 56th Street, in an area claimed by the 5557 Crips. Surveillance video of the shooting showed a black sedan and a gold Lexus travelling down the street.

Raven Hall, a 19-year-old member of the 112 Neighborhood Crips, also associated with the Rolling 50s gang, was present at the shooting. She testified at trial pursuant to a plea agreement. According to Hall, McCoy and appellant were in the front yard of a house and began making gang signs as a car drove by. Someone in the car started shooting. Hall, who was in her gold Lexus with two other people, followed the car with the shooter. She eventually realized that others were also following the car, and decided to return to McCoy's house. Along the way, she picked up Noshi Hughes, a member of the Rolling 30s. The various Rolling O's gangs are aligned with each other.

Appellant asked Hall for a ride, and she agreed. At appellant's direction, Hall drove him, Hughes, and McCoy into an area claimed by the 62 Brims. At 60th and Vermont, Hughes

3

pointed to a girl and asked appellant if he saw her. Appellant looked, then told Hall to pull over. Hall eventually parked in an alley as directed by appellant.

Appellant got out and walked toward Vermont. According to Hall, Hughes said the girl she had pointed out had been involved in Davis's death.

Hall noticed a man taking out some trash. The man asked Hall for her phone number. Hall gave him her name but not her number. The man walked out of the alley. Hall heard gunshots. The man returned and said, "He just did his shit. That nigger just did his shit."

Appellant returned and got into the back seat of the car. He put a Glock into the pocket of his hoodie. Hall drove out of the alley. Appellant said he "had to" because the girl had "set up" his uncle. He said he was sorry. Hall dropped appellant and McCoy off at McCoy's house, then dropped Hughes off and went home.

Surveillance cameras captured a shooting at Vermont and 60th Street around the time Hall heard shots and the man who took out the trash made his observation. The videos of the shooting itself were not good quality and did not provide a clear view of the shooter. The videos did, however, provide a good view of Hall's gold Lexus.

Both the videos and the testimony of witnesses and victims established that a group of young people was standing on the corner when an African-American man in a dark hoodie walked up and opened fire on the group. The young people, all or almost all of whom were students at a near-by high school, scattered and ran. The shooter hit Cleveland, Harris, and Lafayette.

4

Klenard Neadham, who was visiting his girlfriend at a local business at the time of the shooting, took some trash out to the alley next to Alba Snacks. There, he saw a parked gold four-door sedan. A woman who looked like Beyonce was in the driver's seat. An African-American male about 18 years old, wearing a gray hoodie, got out of the car and walked out of the alley toward Alba Snacks. Neadham left the alley, saw the same man talking to another man, then saw the man from the alley pull out a gun and shoot the other man. Neadham ran back into the alley. He heard more gunshots. Neadham then saw the man from the car come back into the alley and get into the back seat of the gold car. As the car sped past Neadham, he saw three people inside. Neadham could not identify the shooter.

One of the high school students in the group on the corner, Julian Myers, noticed the shooter as the shooter came out of the alley next to Alba Snacks and walked toward the group. The man was smiling and had his hands in his pockets. Myers testified he recognized the man from Facebook. Myers testified appellant, as shown in his Facebook profile photograph, looked "exactly like" the shooter, but also stated he was not certain it was the same person.[3]

---

[3] There is some ambiguity in Myers's trial testimony as to whether he recognized appellant when he saw him at the corner of Vermont and 60th because Myers had previously seen appellant on Facebook, or whether he recognized appellant in a Facebook photo he came across later that night when he was scrolling through Facebook.

At trial, Myers was shown a print out of the profile page of appellant's Facebook account, and stated he recognized the person on the right of the photo, appellant, as the shooter. Myers was not asked to identify appellant in court.

According to Myers, appellant asked the group where they were from. Myers understood appellant was asking for their gang affiliation. Harris replied she was from Brims. Appellant began firing at the group. People in the group began running.

Myers ran way. He was running toward an alley when a gray or gold car pulled out. The car was driven by a woman wearing glasses, and there were two other people in the car. Myers believed the person in the front seat was the shooter. The car sped off.

Myers turned and ran to a store because he was worried the car might follow him. Myers saw victim Cleveland trying to walk but he could not because of his injuries. Cleveland appeared to be in pain and was yelling for someone to call his mother. Cleveland was alive when paramedics took him away in an ambulance, but died later from one of the three gunshot wounds he had sustained.

Kierra Harris and Daymond Lafayette, who were in the group of young people standing at the corner, were also wounded by the shooter and taken to the hospital. Both survived.

Lafayette recalled a man in a gray hoodie approaching the group and asking a question. Harris replied. The man began shooting at the group. Lafayette ran inside a nearby donut shop, realized he had been shot in the leg, and called his mother. He could not identify appellant as the shooter at trial.

Harris testified that a man in a gray hoodie asked her where she was from. She stated she kept walking and did not reply. The man kept repeating the question. Harris did not remember telling police that someone said "Westside Brims." Harris heard shots and began to run. She realized she had been shot in the shoulder and eventually sat down on a curb. Harris

denied being associated with a gang and denied anyone in the group on the corner was associated with the Brims. She did not remember telling police that some people in the group were associated with the Brims. She could not identify appellant as the shooter at trial.

As part of the police investigation of the shootings, Los Angeles Police Department (LAPD) Detective Gorgonio Medina obtained search warrants for Snapchat and Facebook records relating to appellant from November 2016 through June 2017. The detective also obtained search warrants for Hall's and Cleveland's social media records for the same period.

Appellant's Facebook entries in December 2016 mentioned the murder of his uncle. In one exchange about two weeks after the murder, appellant acknowledged he had a gun. Appellant's Facebook entries for April 4-7, 2017 referred to his uncle and to "Fat Strap" which was a nickname for victim Cleveland, who was overweight.

LAPD Officer Michael Alvarez, a gang expert, provided background information on the gangs mentioned in connection with the shootings. In response to a hypothetical based on the facts of this case, Officer Alvarez opined the shootings were committed in association with other gang members and were done for the benefit of the gang.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Admitting the Facebook Exchange Related to a Gun.*

Appellant contends his admission in December 2016 on Facebook that he had a gun did not show that he had a gun on April 4, 2017 and so was not relevant to the charges against him.

He also argues evidence of his past possession of a gun was prejudicial. He contends the trial court abused its discretion in admitting the statement and violated his right to due process. We see no abuse of discretion and no due process violation.

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) " ' "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive." ' " (*People v. Young* (2019) 7 Cal.5th 905, 931 (*Young*).) Even relevant evidence may be excluded "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We review a trial court's decision under Evidence Code section 352 for an abuse of discretion, and do not disturb that ruling unless " ' "the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." [Citation.] When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error.' " (*Young, supra*, 7 Cal.5th at p. 931.)

At the hearing on the admissibility of the Facebook statement, the prosecutor noted that the remark was made as part of a conversation about appellant's uncle's murder, which took place about two weeks after that event. The prosecutor contended it "shows already the beginning of a plan to retaliate . . . . [¶] And in this case, obviously, there's going to be issues of motive, premeditation." Appellant's counsel pointed out the age of the statement, and argued: "A lot of things can happen. Being

8

angry at the time of close to an incident, and many months later, time—things cooled off." The court replied the age of the statement "really goes more to the weight that the evidence is going to be given as opposed to admissibility." The court added that the evidence "goes directly to the People's theory."

The Facebook exchange is clearly probative of the issues of appellant's motive and premeditation. The trial court was correct concerning the age of the exchange. "[T]he passage of time generally goes to the weight of the evidence, not its admissibility." (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 968; see *People v. Taylor* (2001) 26 Cal.4th 1155, 1172–1173 [testimony about defendant's plan to commit a murder to steal a particular type of car years before the charged murder and theft of such a car was admissible to rebut defendant's attempt to disclaim any preexisting intent; remoteness of plan "would affect its weight, not its admissibility."]; see also *People v. Scott* (2011) 52 Cal.4th 452, 490 [evidence of defendant's habitual behavior months before charged offenses went "to the weight, not the admissibility, of the evidence."].)

 Appellant does not explain why, under the facts of this case, evidence that he possessed a gun was likely to invoke a "uniquely emotional bias against him as an individual." Gun violence was common in appellant's milieu:  not only was appellant's uncle shot, it was a drive-by shooting which spurred the murder and attempted murders in this case. (See *People v. Lenart* (2004) 32 Cal.4th 1107, 1125 [evidence that defendant possessed gun not unduly prejudicial where it was not uncommon behavior among the witnesses at trial].)

Because we find no abuse of discretion in the admission of the evidence, we reject appellant's claim that the admission

9

violated his federal constitutional right to due process. Further, the admission of evidence, even if error under state law, does not violate due process unless "it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 436.) Appellant has not made such a showing.

B.      *Appellant Has Forfeited His Claim of Prosecutorial Misconduct.*

Appellant contends the prosecutor impermissibly vouched for Hall by repeatedly questioning her to elicit testimony that her plea deal was contingent on testifying truthfully. The prosecutor compounded the vouching by also discussing this requirement in closing argument. We agree with respondent that appellant has forfeited these claims. Appellant has identified five questions and three statements during closing argument that he contends amounted to vouching; at trial, he did not object to any of them or request an admonition. (*People v. Krebs* (2019) 8 Cal.5th 265, 341; *People v. Bonilla* (2007) 41 Cal.4th 313, 336 (*Bonilla*) [vouching during closing argument forfeited]; *People v. Price* (2017) 8 Cal.App.5th 409, 459 [vouching claim based on questioning forfeited].)

Appellant requests that we exercise our discretion and consider the claim. Appellant suggests such review might forestall any later charge of ineffective assistance of counsel. California law *requires* that the terms of a plea agreement, or any agreement affecting the witness, be disclosed to the jury " ' "to ensure the jury has a complete picture of the factors affecting the witness's credibility." ' " (*Bonilla*, *supra*, 41 Cal.4th at p. 337; see *People v. Perez* (2018) 4 Cal.5th 421, 459.) Thus, "[i]t is settled that making a record of the terms of a plea agreement requiring a witness to tell the truth does not constitute impermissible

vouching." (*People v. Williams* (2013) 56 Cal.4th 165, 193, overruled on another ground by *People v. Elizalde* (2015) 61 Cal.4th 523, 538, fn. 9.)  This includes making a record by questioning the witness.  (*Williams*, at pp. 189–191.)  Likewise, a prosecutor does not commit impermissible vouching when she argues that a witness "should be believed because he had an incentive to tell the truth under the terms of his plea agreement." (*Bonilla,* at p. 337.)

As appellant highlights, the prosecutor remarked during closing argument "that if a neutral magistrate, such as this trial judge, were to determine that [Hall] did not give truthful testimony, then she would be sentenced on the murder charge, which she's already pled to."  Appellant contends this statement implied that the judge presiding over the case would have special knowledge as to whether Hall was telling the truth and also implied that the judge, not the jury, would be the "final arbiter" of Hall's truthfulness.

While it is important that a jury learn what would happen to a witness if she fails to testify truthfully, "the precise mechanism whereby [her] truthfulness would be determined was not a matter for its concern."  (*People v. Fauber* (1992) 2 Cal.4th 792, 823.)  As our Supreme Court has explained, suggesting that the trial court would decide the witness's credibility "arguably carried some slight potential for jury confusion, in that it did not *explicitly* state what is implicit within it: that the need for such a determination would arise, if at all, in connection with [the witness's] sentencing, not in the process of trying defendant's guilt or innocence.  For these reasons, had defendant objected to its admission, the trial court would have acted correctly in excluding it on a relevancy objection."  (*Ibid.*)  The Supreme

11

Court found no possibility in *Fauber* that defendant was prejudiced by its admission because the "jury could not reasonably have understood [the] plea agreement to relieve it of the duty to decide, in the course of reaching its verdict, whether [the witness's] testimony was truthful." (*Ibid.*) The Supreme Court's conclusion was reinforced by the fact that the trial court instructed jurors at the beginning and end of the case that they were " 'the sole judges of the believability of a witness and the weight to be given to his testimony.' " (*Ibid.*) The Court also noted that the prosecutor had "emphasized the jurors' role as sole judges of credibility." (*Id.* at p. 824.)

The circumstances here are very similar. The trial court instructed the jury at the beginning and end of the case: "You alone must judge the credibility or believability of the witnesses." After the reference to the trial judge, the prosecutor stated: "So she's in a position where she has to be truthful. But how do *you* know whether she is actually being truthful or not? You have to listen to her testimony." (Italics added.) Accordingly, we see no possibility that appellant was prejudiced by the prosecutor's reference to the trial judge.

C.    *Hall's Testimony Was Sufficiently Corroborated.*

Appellant contends there is insufficient evidence to provide the required corroboration of Hall's accomplice testimony and so his convictions must be reversed. We do not agree.

Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

12

"[A]n accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the crime or physical evidence from the crime scene. Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*. Rather, under section 1111, the corroboration must connect the defendant to the crime *independent* of the accomplice's testimony." (*People v. Romero and Self* (2015) 62 Cal.4th 1, 36 (*Romero and Self*).) " 'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.' [Citations.] The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and ' "may be circumstantial or slight and entitled to little consideration when standing alone." ' " (*Id.* at p. 32.) A defendant's own statements and admissions may corroborate an accomplice's testimony. (*People v. Dalton* (2019) 7 Cal.5th 166, 245–246.)

The corroboration requirement for accomplice testimony is an exception to the substantial evidence rule: the Legislature has determined that such testimony standing alone is insufficient as a matter of law to support a conviction. (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.)

Hall's testimony was sufficiently corroborated by Myers's testimony that he recognized appellant as the shooter from or in a Facebook photograph of appellant. Appellant points out that Myers expressed some uncertainty about whether appellant was the same person as the shooter. Myers acknowledged he had expressed uncertainty, but he was also clear that, in his mind,

appellant's Facebook photograph looked "exactly like" the shooter.

We conclude Myers's testimony is sufficient corroboration of Hall's testimony. It places appellant at the scene of the shooting as the shooter. Nevertheless, Hall's testimony was further corroborated by some of appellant's own statements on Facebook and Snapchat, taken in context. In the late afternoon of April 4, 2017, appellant posted: "Long Live 50 Bang." Later that evening, he updated his status to read: "I'm the sickest young 16-year-old ever Crip! Doubt me if you want." About 20 minutes later, appellant sent a message stating: "Fuhk Fat Boy" and "the bitch." He then messaged: "I'm Slobkn." This meant he was killing Bloods. On the evening of April 6, 2017, appellant sent a message saying: "He gone" and "It was easy." In the early morning of April 7, 2017, appellant sent a photograph of a drawing of an overweight body with three gunshots, which was the number of times Cleveland had been shot. The name "Fat Strap" is crossed out. The first four messages, with their reference to 50 Bang, animus to "Fat Boy" and self-referential bragging (I'm the sickest; I'm Slobkn), were made very soon after the shooting and tend by that timing to connect him to the commission of the crime. Similarly, the last two messages indicate knowledge of the details of the shooting (it was "easy" and Cleveland was shot three times) and so also tend to connect appellant to the shooting. Corroborating evidence may be " ' "circumstantial or slight and entitled to little consideration when standing alone." ' " (*Romero and Self, supra*, 62 Cal.4th at p. 32.)

## DISPOSITION

The judgment of conviction is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, J.

We concur:



GRIMES, Acting P. J.



WILEY, J.


15